**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-542-TJK** |
| **v.** | : | |
| | : | |
| **JONATHON OWEN SHROYER** | : | |
| | : | |
| **Defendant.** | : | |

**GOVERNMENT'S OPPOSITION TO**
**DEFENDANT'S MOTION TO DISMISS AND FOR A _FRANKS_ HEARING**

The defendant, Jonathon Owen Shroyer, alleges that the government concealed material facts in seeking his arrest warrant, is vindictively prosecuting him for his speech, and has charged him with multiplicitous counts. These arguments are meritless.

**PROCEDURAL BACKGROUND**

Shroyer is charged by criminal information with: (1) Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); (2) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); (3) Disorderly Conduct in Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and (4) Obstructing or Impeding Passage through or within Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(E). _See_ Dkt. 5. These charges stem from the defendant's conduct in Washington, D.C., on and around January 6, 2021.

**FACTUAL BACKGROUND**

**I.     DECEMBER 9, 2019**

On December 9, 2019, the defendant was arrested in Washington, D.C., after disrupting a House Judiciary Committee meeting in the Longworth House Office Building by jumping out of his seat and shouting in a loud manner. _See_ Dkt. 1 (citing Case Num. 2020 CMD 000820). On

January 17, 2020, the defendant was charged by a Criminal Information in the Superior Court of the District of Columbia with (1) Disorderly and Disruptive Conduct on United States Capitol Grounds, in violation of 10 D.C. Code § 503.16(b)(4); and (2) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 10 D.C. Code § 503.16(b)(7). *See id*.

On February 25, 2020, the defendant entered into a Community Service Deferred Prosecution Agreement ("DPA") with the government. *See* Dkts. 1, 8-3. As part of the agreement, the defendant agreed not to violate any laws and to perform 32 hours of verified community service. *See* 8-3 at 2. Due to the nature of the offense, the defendant also agreed to follow certain special conditions listed in an Addendum to the DPA:

1. The defendant agrees not to utter loud, threatening, or abusive language, or to engage in any disorderly or disruptive conduct, at any place upon the United States Capitol Grounds or within any of the Capitol Buildings with intent to impede, disrupt, or disturb the orderly conduct of any session of the Congress or either House thereof, or the orderly conduct within any such building of any hearing before, or any deliberations of, any committee or subcommittee of the Congress or either House thereof.

2. The defendant agrees not to parade, demonstrate, or picket within any of the Capitol Buildings.

3. The term "Capitol Buildings" means the United States Capitol, the Senate and House Office Buildings and garages, the Capitol Power Plant, all subways and enclosed passages connecting 2 or more such structures, and the real property underlying and enclosed by any such structure.

4. The term "United States Capitol Grounds" means the areas delineated in the map below.

*See id*. at 5. As referenced, the DPA included a map that demarcated the "U.S. Capitol and Grounds," using the following boundaries:

> U.S. Capitol Building and Grounds to include all Congressional Buildings and the areas bound by 3rd Street NW / Constitution Avenue NW / Louisiana Avenue NW / 1st Street NW / C Street NW / Louisiana Avenue NW / New Jersey Avenue NW / D Street NW / Louisiana Avenue NW / North Capitol Street NW / Massachusetts Avenue NE / Columbus Circle NE / F Street NE / 2nd Street NE to SE / C Street SE / 1st Street SE / D Street SE / South Capitol Street SW / Washington Avenue SW / Independence Avenue SW / 3rd Street SW, Washington, D.C.

*See id*. at 6.  The map also provided a visual representation of these boundaries, as seen below:



*See id*.  The defendant and his attorney signed the DPA on February 25, 2020.  *See id*. at 4.

While the DPA was for a 4-month term, the COVID pandemic emergency tolled this time period for the defendant to complete his hours.  *See* Dkt. 1 (citing D.C. Superior Court Case Num. 2020 CMD 000820).  As of January 5 and 6, 2021, the defendant had not completed any hours of community service, and the DPA was still active.  *See id*.  The defendant only began completing community service hours after January 6, 2021, and the DPA was active at the time of the defendant's arrest in August 2021.  *See id*.  The government has revoked the defendant's DPA in that case given his arrest in this case.  The Superior Court has held the DPA open, pending resolution of this case.  *See*, D.C. Superior Court Case Num. 2020 CMD 000820.

## II.  JANUARY 5, 2021

On January 5, 2021, the defendant addressed a camera and crowd at Freedom Plaza in Washington, D.C.: "Americans are ready to fight.  We're not exactly sure what that's going to look like perhaps in a couple of weeks if we can't stop this certification of the fraudulent election of Joe Biden."  He added, "We are the new revolution!  We are going to restore and we are going to save the republic!"[1]  That day, the defendant also called into a live broadcast on the "Infowars" internet program, stating "What I'm afraid of is if we do not get this false certification of Biden stopped this week, I'm afraid of what this means for the rest of the month, I'm afraid of what this is gonna mean to these Trump supporters, and I'm afraid about what this is going to mean about January 21st … Everybody knows this election was stolen … Are we just going to sit here and become activists for four years or are we going to actually do something about this, whatever that cause or course of cause may be?"[2]

## III.  JANUARY 6, 2021

### A.  The defendant's march to the Capitol

On January 6, 2021, a Joint Session of the United States Congress, consisting of the House of Representatives and the Senate, convened in the United States Capitol building to debate and certify the vote of the Electoral College of the 2020 U.S. Presidential Election, which resulted in Joseph R. Biden amassing more electoral votes than President Donald J. Trump, and thus being the winner of the election.  Vice President Michael R. Pence, as the President of the Senate, presided over the Joint Session and, later, the Senate proceedings.  Dkt. 1 at 1.  The Capitol

---

[1]  *See* Dkt. 1 at 3 n.1 (citing https://banned.video/watch?id=5ff4aebaa285a02ed04c4d6e (last accessed on November 12, 2021)).

[2]  *See* Dkt. 1 at 3 n.2 (citing https://banned.video/watch?id=5ff511bb5a212330029f5a9c (last accessed on November 12, 2021)).

Building is secured 24 hours a day by the United States Capitol Police.  *Id*.  Restrictions around

the Capitol Building include permanent and temporary security barriers and posts manned by law

enforcement.  *Id*.  On January 6, the exterior plaza of the Capitol was also closed to members of

the public, surrounded by law enforcement officers, temporary and permanent barricades, and

signage.  *Id*.

Early that afternoon, crowds of people began to gather and head toward the Capitol

perimeter.  The defendant took to a megaphone in front of one of those crowds on Pennsylvania

Avenue:

> In 1776, the American patriots sent a loud message to the entire world: Tyranny
> will not exist in the West.  And so now the Democrats are posing as communists,
> but we know what they really are: they're just tyrants, they're tyrants.  And so
> today, on January 6, we declare death to tyranny!  Death to tyrants!  Death to
> tyrants!  Death to tyrants!

The defendant made it clear why he was headed to the Capitol: "Today we march for the Capitol

because on this historic January 6, 2021, we have to let our Congressmen and women know, and

have to let Mike Pence know, they stole the election, we know they stole it, and we aren't going

to accept it."

After hearing that people may have breached the Capitol, the defendant, Person One,[3] and

others began leading this large crowd down Pennsylvania Avenue toward the Capitol Building.[4]

The defendant is encircled in red below with a megaphone, at the front of the crowd.

---

[3] As of January 6, 2021, Person One ran the "Infowars" website and hosted shows on the program.

[4] *See* Dkt. 1 at 4 n.5 (citing  https://banned.video/watch?id=5ff634c2f23a18318ceb19f1  (last accessed on November 12, 2021)); *see also* Dkt. 1 at 6 n.8 (citing https://banned.video/watch?id=5 ff6148af23a18318ce99233 (last accessed on November 12, 2021)).



En route, the defendant continued shouting to the crowd walking behind and around him through his megaphone: "The traitors and communists that have betrayed us know we're coming. We're coming for all you commie traitors and communists that have stabbed us in the back. You've stabbed us in the back one too many times!"  He continued, "We will not accept the fake election of that child-molesting Joe Biden, that Chinese Communist agent Joe Biden, we know where he belongs and it's not the White House!"  The defendant then led chants of "Stop the steal!" and "1776!"—an apparent reference to the "first" American Revolution and a renewed need to overthrow the government.[5]

**B.      The defendant's actions on the west side of the Capitol**

After the Joint Session got underway at 1:00 p.m., the defendant entered the Capitol Grounds.  He first positioned himself with others on the west side of the Capitol Building, within both the restricted area on January 6 and the broader Capitol Grounds boundaries on the defendant's DPA map seen above.  There, he stood on stacks of chairs and other equipment with

---

[5] *See supra* Note 3.

Person One and led a crowd of hundreds of individuals on the Capitol grounds in chants of "USA!

USA!  USA!"[6]  The defendant is encircled in red below on the Capitol grounds soon after leading

these chants with a megaphone.



### C.     The defendant's movement to the east side of the Capitol[7]

Eventually, the defendant and others walked east along the Capitol lawn and around the

north side of the Capitol Building.  A purported security guard for Person One, wearing a body-

worn camera, announced to the defendant and others, "Let's take a break right here.  Let me talk

to this cop and see if I can get [Person One] up there and deescalate the situation."  This body-

camera individual then walked up to a uniformed law enforcement officer guarding the perimeter

---

[6] *See* Dkt. 1 at 4 n.6 (citing https://banned.video/watch?id=5ff9df636756f238a5bf9124 (last accessed on November 12, 2021)).

[7] This section relies on an open-source video purporting to be the body-worn camera video of Person One's private security guard, provided in its entirety via an active link in the Complaint. *See* Dkt. 1 at 6 n.7 (citing https://banned.video/watch?id=5ffe25bc0d763c3dca0c4da1 (last accessed on November 12, 2021)).

of the Capitol Building and engaged in the following dialogue while tens of others surrounded the pair, including the defendant:

INDIVIDUAL:     I'm with [Person One], man.  I'm telling you right now, he just tried to deescalate this stuff.  If we can talk to someone and get him up there, we can get them to back off.

OFFICER:        Take it over to the east, the east front's the problem now. *Pointing east.*

INDIVIDUAL:     This is the problem?  *Pointing east.*

OFFICER:        East front is the problem now.

INDIVIDUAL:     Ok, so we need to get him up there and tell people to …

OFFICER:        The east front is the problem now.

INDIVIDUAL:     Alright, is there a way that we can get him to a position …

OFFICER:        Through the hole, through the hole that you guys breached right there *Pointing northeast away from the Capitol Building.*

INDIVIDUAL:     We didn't breach anything.

OFFICER:        Well, the whole group that was with you guys.

INDIVIDUAL:     We're just trying to help.

OFFICER:        Out through there, all the way out there, take him up there. *Pointing northeast, away from the Capitol Building.*

The defendant, Person One, the body-camera individual, and others then all began walking away from the officer, continuing east around the Capitol Building.  As the defendant and his group curved around the Capitol Building, the body-camera individual stated, "Here's an opening right here."  The defendant and his group then walked toward where the body-camera individual pointed, passing downed and moved temporary barricades and stepping over at least one fallen sign that appeared to read "Area Closed," as seen below circled in red.



Soon after stepping over the above sign, the body-camera individual turned around and showed the defendant, among others, walking with him on the Capitol Grounds in the restricted area.



Once on the east side of the Capitol building, the body-camera individual again attempted to speak to law enforcement officers guarding the perimeter of the Capitol Building to get Person One on the Capitol Building steps:

| | |
|---|---|
| INDIVIDUAL: | I'm with [Person One], man.  He's a big, big, like, Populist movement guy.  He will deescalate the situation, but we got to put him somewhere to speak to them.  We just did it on that side to pull people off the scaffolds.  If not, the mob's a mob.  But I'm telling you, this entire crowd will listen to him, that's a fact.  So where can we take him and talk to the people, so that this doesn't turn into something it doesn't need to be … who can we coordinate with?  We've got tons of law enforcement with us. |
| OFFICER: | There's got to be an official somewhere, but everyone's running around like … |
| INDIVIDUAL: | I get it and we're trying to help, dude.  And I'm telling you, you will see a miracle happen if it happens. |
| OFFICER: | That guy right there with the [unintelligible] shoulder. (*Points to another officer guarding the perimeter of the Capitol Building.*) |

The body-worn camera individual then walked to a third set of officers guarding the Capitol Building and began the same requests to one particular officer:

| | |
|---|---|
| INDIVIDUAL: | Boss, I was told to speak to you.  One of [Person One's] security guards.  He can deescalate this entire situation if you give him a little platform to speak to the crowd.  I promise you. |
| OFFICER: | I'm not authorized to do that. |
| INDIVIDUAL: | I know.  I don't want it to turn into something it's not.  I'm telling you, you can help.  We've got tons of law enforcement in our team, man.  He wants to help.  They will listen to him. |
| OFFICER: | I'm not authorized to do that. |
| INDIVIDUAL: | Ok, what do you recommend? |

OFFICER:               I don't know, I can call somebody higher up.

The law enforcement officer then walked up a few Capitol steps and spoke with another officer. They cannot be heard on the video.  The body-camera individual continued to yell that Person One could deescalate the situation, begging them to let Person One speak to the crowd.  The two officers speaking then walked away and out of sight.  The body-camera individual exhorted, "Nah, that's not good, dude.  That's not good.  That's fucked.  That's fucked.  No way.  No fucking way.  No way."

The body-worn camera individual then walked back to the defendant's group and led them along the perimeter of officers, stating "they're telling them to 'hold the line.'"  He then approached a fourth set of officers:

INDIVIDUAL:         Guys, I don't know who's in charge.  We tried to get in a call.  If we can get [Person One] up there, we can deescalate this whole thing.  They all follow him.  It'll all turn peaceful.  He just has to speak.  I'm telling you, dude.  We're all on the same team.  This shit is not gonna be good.

OFFICER:               If you can get him up there, go for it.

INDIVIDUAL:         But I don't want to break the law, I'm on your team.

OFFICER:               They already breached the [unintelligible].

INDIVIDUAL:         That doesn't make it ok … We got all retired special ops guys, law enforcement, we're not trying to be wrong.  So who do we talk to, to make this happen the right way?

After the officer again suggested that Person One just go to where the crowd of rioters had already breached, the body-camera individual balked and retorted, "I was already talking to another officer, and he was talking to somebody but …" as he shrugged his shoulders—presumably referring to the previous officers that did not give him a response.

The body-camera individual then walked back toward the defendant's group and asked, "Just get him up there?  Hey, Tim, just get him up there?  Just do it?  But we know we might catch a bang or two."  At that point, the video ends.

### D.      The defendant's actions on the east side of the Capitol

The defendant, Person One, the body-camera individual, and others then approached and entered the Capitol Building's east steps with their hands on each other's backs and shoulders in a "stack," snaking through hundreds of other rioters and deeper into the restricted area.  Once the defendant and others nearly reached the top, he began to use his megaphone to lead the large crowd in various chants, including "USA!" and "1776!"—again, a reference to revolution.[8]   The defendant is seen below on the right standing near the top of the Capitol Building's east steps with his megaphone while leading one of the chants:



---

[8]  *See* Dkt. 1 at 4 n.6 (citing https://banned.video/watch?id=5ff9df636756f238a5bf9124 (last accessed on November 12, 2021)).

Soon after, on January 6, the defendant explained in an interview what his and others' actions were about while rioters can be seen continuing to breach the Capitol Building behind him:

> We're here fighting for President Trump, we're here fighting for our elections, we're here fighting for the Republic. We want to use this day as we're seeing all the traitors in the Republican party and Congress, everywhere, stab us in the back … Trump is now a man on a mountain by himself, and he has we the people fighting for him … We want freedom, we want liberty, and when the government fears the people, we have that … We the people are not going to stand for their treason, and we the people are not going stand for rigged elections … We just want a send a peaceful message to … Mike Pence and the congressmembers, 'hey, we voted for Donald Trump, he won the election, you know it, you better do the right thing and not certify the fake vote for Biden.'[9]

In sum, using the defendant's DPA map of the Capitol and Capitol Grounds, the defendant's actions detailed above took place approximately on the west side of the Capitol ("1"), along the red line around the north side of the Capitol Building, and on the east side steps of the Capitol Building itself ("2")—all within the restricted area on January 6, 2021, and all within the delineated boundaries the defendant agreed to be bound by in February 2020.  *See* Dkt. 8-3 at 6.



---

[9] *See* Dkt. 1 at 4 n.5 (citing https://banned.video/watch?id=5ff634c2f23a18318ceb19f1 (last accessed on November 12, 2021)).

**ARGUMENT**

The defendant raises three arguments in seeking dismissal of the counts against him or, in the alternative, a *Franks*[10] hearing: (1) the government withheld material evidence from the Complaint that would have nullified probable cause; (2) the government's prosecution of the defendant is vindictive and in violation of his First Amendment rights; and (3) Counts Two and Three are multiplicitous in violation of his Fifth Amendment right against Double Jeopardy.  None of these arguments has merit.

## I.  LEGAL STANDARD

A defendant may move to dismiss a criminal information or count prior to trial.  *See* Fed. R. Crim. P. 12(b)(3)(B).  A pretrial motion may challenge "a defect in the indictment or information" if "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits."  *Id.*  Although a court's supervisory powers provide the authority to dismiss a charging document, "dismissal is granted only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015).

The charging document "must be viewed as a whole" and the "allegations must be accepted as true" in determining if an offense has been properly alleged.  *United States v. Bowdoin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011).  The operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed.  *Id.*

## II.  THE GOVERNMENT DID NOT CONCEAL EVIDENCE

The defendant first argues that the government "omitted material information from the sworn information that it presented to the Court to obtain an arrest warrant for Shroyer."  Dkt. 8-1 at 6.  Specifically, the defendant points to (1) a body-camera video of a purported security guard

---

[10] *See Franks v. Delaware*, 438 U.S. 154, 171 (1978).

for Person One he alleges shows law enforcement permitting the defendant to enter the restricted area, and (2) Twitter videos he alleges show law enforcement officers moving barricades and waving rioters onto the Capitol Grounds.  These omissions, the defendant concludes, warrant dismissal of the information or at least a *Franks* hearing pursuant to the Fourth Amendment.  Dkt. 8-1 at 2, 6-7.  The government did not conceal any evidence, and these videos do not show what the defendant alleges them to show.

A.     ***Franks* Hearing Legal Standard**

A movant seeking to obtain a *Franks* hearing must show that (1) the affidavit contained false statements or material omissions; (2) the statements or omissions were material to the issue of probable cause; and (3) the false statements or omissions were made knowingly and intentionally, or with reckless disregard for the truth.  *United States v. Robinson*, 2021 WL 2209403 at *13 (D.D.C. May 31, 2021) (citing *United States v. Becton*, 601 F.3d 588, 594 (D.C. Cir. 2010); *United States v. Williams*, 827 F.3d 1134, 1146 (D.C. Cir. 2016)).  "An omission is 'material' only if its inclusion in the affidavit would have 'defeat[ed] probable cause.'"  *Id*. (quoting *Becton*, 601 F.3d at 597); *see also United States v. Wharton*, 840 F.3d 163 (4th Cir. 2016) ("Even if relevant, information is not material unless its inclusion in the affidavit would defeat probable cause.") (internal quotation marks and citation omitted).  "To mandate an evidentiary hearing,' the movant's attack on the affidavit supporting the warrant 'must be more than conclusory.'"  *Id*. (quoting *Franks v. Delaware*, 438 U.S. 154, 171 (1978)).

B.     **The government provided the body-camera video, which does not show officers permitting the defendant to enter the restricted area**

The thrust of the defendant's argument is that the government withheld key, exculpatory details from a 22-minute video ("body-camera video") from the body-camera individual, a purported security guard for Person One.  His argument fails on multiple fronts.

First, the defendant is simply, and factually, wrong.  The government did *not* withhold any details from the body-camera video, but rather provided an active link to the entire video for the Court's review in determining whether there was probable cause to arrest the defendant.  Dkt. 1 at 6 n.7.  That link continues to be active as of this filing, on November 12, 2021.  In fact, the government provided active links to *every* video the government relied on in its Complaint seeking an arrest warrant.  Providing the full videos underlying the government's assertion of probable cause to arrest hardly amounts to withholding the video from the Court.

Second, the defendant repeatedly mischaracterizes the body-camera video.  He asserts that the video shows "Shroyer's bodyguard" talking to United States Capitol police officers and expressing that "Shroyer and his colleagues" wanted to help deescalate the situation.  Dkt. 8-1 at 8.  Never once does the body-camera individual utter the defendant's name, let alone to any law enforcement officers.  He does not introduce himself as the defendant's bodyguard, he does not request permission for the defendant to enter any areas or deescalate any crowds, and he does not state that the defendant wants to help.  He specifically tailors his requests to Person One, not the defendant.  Even assuming the recorded conversations amounted to explicit or implicit permission for some (they did not), the defendant was not included in the scope of that permission.

The defendant also claims that "the United States actually gave Shroyer permission to be in any restricted area by first telling him that its police officers could use his help on the other side of the Capitol building and telling him to go there."  Dkt. 8-1 at 12.  None of these interactions happened in the video the government possesses and included in its Complaint.  No officers told the defendant that they could use his help anywhere; in fact, no officers appeared to speak to the defendant, only talking with the body-camera individual.  And, again, that individual and the officer only discussed Person One.  Far from giving the defendant permission to go to the "other

side," it is clear the officer viewed this group as part of the problem.  After repeatedly waving them off and pointing to the northeast, *away* from the Capitol Building, the defendant dismissively kept telling them "East front is the problem now."  When the body-camera individual asked if he could get Person One there, the officer stated, "Through the hole that *you guys* breached right there" (emphasis added).  When the body-camera individual responded that he didn't breach anything, the officer retorted, "Well, the whole group that was with you guys."  The officer then pointed again away from the Capitol Building toward the northeast, telling them to leave through the same hole he had just said other rioters had breached.  An officer surrounded by people illegally on the Capitol Grounds dismissively waving them away from the Capitol Building and toward another area hundreds of others had already illegally breached does not amount to "telling [the defendant] that … police officers could use his help."

The defendant then stresses that law enforcement officers asked the defendant "to remain near them" while they "pled with their superiors to allow Shroyer and his colleagues to help them deescalate the crowd." Dkt. 8-1 at 8, 12.  This interaction also did not happen, at least on the video the government possesses and provided to the U.S. Magistrate Court.  An officer explicitly denied the body-camera individual's request for officers to give Person One access to the Capitol steps, telling him multiple times "I'm not authorized to do that."  When the officer's repeated denials were unsuccessful at getting the group to disperse, the officer stated, "I don't know, I can call someone higher up."  That officer then goes to another officer and appears to talk, but their conversation is inaudible on the video.  After a while, those officers then walk away without addressing the body-camera individual, who yells, "Nah, that's not good, dude.  That's not good.  That's fucked.  That's fucked.  No way.  No fucking way.  No way."  Absent from the video is an officer's request for the defendant to remain where he was, or any of the officers pleading for

Person One (let alone the defendant) to gain access to the Capitol steps.  What is in the video is a series of rejected requests from the body-camera individual and frustration when he doesn't get what he wants.

Even assuming the defendant's argument is true and the defendant received permission to go to the Capitol steps for the limited purpose of deescalating the situation, the defendant did not even do that.  Quite the opposite.  Despite the defendant's arguments today that "Shroyer did nothing but offer his assistance to calm the crowd and urge them to leave United States Capitol grounds," Dkt. 8-1 at 14, the defendant himself said otherwise in an open-source video recorded on August 21, 2021: "From the minute we got on the Capitol, the Capitol area, you [referring to Person One] started telling people to stand down, and the second we got on there, you got up on stacks of chairs, you said, 'We can't do this, stand down, don't go in.' … And I'm *silent* during all of this" (emphasis added).[11]  Moreover, as seen in other videos and described above, the defendant forced his way to the top of Capitol Building's east steps with Person One and others and led hundreds of other rioters in multiple "USA!" and "1776!" chants with his megaphone. Harkening to the last time Americans overthrew their government in a revolution while standing on the Capitol steps where elected representatives are certifying a Presidential Election you disagree with does not qualify as deescalation.

The defendant finally asserts that he could not have known that he was in a restricted area, because there were no signs in the video that the defendant was somewhere he was not supposed to be and the officers provided no commands for them to leave.  Neither argument holds water. Notably, the body-camera video *does* show downed and moved temporary barriers and at least one

---

[11] *See* https://banned.video/watch?id=612177a73ab9b56325da2d9e (last accessed on November 12, 2021).

sign that clearly reads "AREA CLOSED" that the defendant and his group stepped over while moving to the Capitol Building steps.  But, more than that, the video brings to life the defendant's surroundings that make it clear they were in an area they should not be: uniformed officers guarding the perimeter of the Capitol Building, explosions in the distance throughout the Capitol Grounds, smoke or tear gas at one point choking the body-camera individual and those around him, hundreds of others rushing toward the Capitol Building and climbing the scaffolding and surrounding buildings, Person One's and others' repeated yells for people to retreat from the Building and deescalate, multiple officers referring to the defendant's group as part of the problem and referring to the actions as "breaching."[12]  And the officers' lack of clear commands to exit immediately does not dissolve the import of that evidence or absolve the defendant of guilt.  After hundreds of rioters had already breached the Capitol Grounds, including the defendant and others, these officers had shifted to a mission of securing the perimeter of the Capitol Building and preventing further penetration into the restricted areas and buildings than the rioters had already accomplished.  And, at the time of the video, the officers continued to be surrounded by hundreds more individuals illegally on the Capitol Grounds—they executed their mission in that moment not by arresting rioters like the defendant on sight, but by guarding the Capitol Building and not letting individuals up the steps.

If anything, the additional details in the video at issue only strengthen the probable cause that the defendant committed the charged crimes.  The video shows the defendant on an elevated platform leading chants with his megaphone on the Capitol Grounds *before* his first interaction with law enforcement officers; it shows the body-camera individual repeatedly (and

---

[12] Buttressing the government's position is the defendant's literal map of the Capitol Grounds and Buildings and delineation of certain proscribed conduct pursuant to the DPA he signed in February 2020.

unsuccessfully) try to get Person One on the Capitol steps; it shows evidence that the defendant reasonably should have known he was somewhere he was not supposed to be, including by stepping near moved barriers and downed signs; and it shows officers repeatedly refer to the defendant's group as part of the problem and the "breaches" of various police lines.  In fact, at the end of the video, the body-camera individual took matters into his own hands after facing multiple rejections for permission.  He turned to the group and asked, "Just get him up there? … But we know we might catch a bang or two."  That is not evidence that the defendant received explicit or implicit permission to go onto the Capitol steps.  That is evidence that the defendant is guilty of the crimes he is charged with.

The video speaks for itself.  The same video the government provided to the U.S. Magistrate Court and now to this Court.  The defendant's arguments that the government omitted material facts that would have altered the U.S. Magistrate Court's probable cause finding misses the mark.  The government did not omit anything, and the evidence it purportedly omitted would only serve to aid the government's case that there was probable cause to arrest the defendant.  *See United States v. Glover*, 681 F.3d 411, 419 ("[I]ncluding information about the wiretapped conversation would only have strengthened the case for probable cause.  So the argument fails.").  No *Franks* hearing is warranted, let alone dismissal of the defendant's charges.

### C.  Two unrelated Twitter videos do not warrant a *Franks* hearing or dismissal

The defendant also repeatedly cites to two videos from Twitter that do not appear to depict anyone related to this case or the relevant areas the defendant allegedly trespassed.  Instead, they appear to show 9- and 13-second clips of officers interacting with other rioters, temporary barriers, and individuals and items off-screen.  The defendant apparently argues that these videos prove a

select few officers' actions that day made the boundaries of what was "restricted" on January 6 indiscernible for all, including the defendant who is not in the videos.

But context matters.  One of the videos the defendant rests his argument on appears to show a law enforcement officer waving off screen while rioters around the officer surge through the Capitol Grounds and toward the building itself.  *See* Dkt. 8-1 at 9 n.4.  This must mean, the defendant asserts, that officers permitted rioters to enter the restricted area, thereby exculpating the defendant who entered the grounds elsewhere.  Other open-source videos, however, appear to show another angle of the same moment, in which the officer is waving to other law enforcement officers who proceed to follow him away from the rush of rioters who are seen moving the barricades themselves.[13]  Besides there being no logical connection between these videos and the defendant's conduct somewhere else, the videos do not even appear to show what the defendant claims they do.

Devoid of context, timestamps, or facts relating these Twitter videos to this case, the defendant's argument fails to meet his burden of showing the government intentionally or recklessly omitted a material fact in seeking to arrest him.  *See Franks*, 438 U.S. 154.  Without more, his motion for an evidentiary hearing or dismissal of his charges should be denied.

## III.   THE DEFENDANT CANNOT ESTABLISH A "REALISTIC LIKELIHOOD" OF VINDICTIVENESS LET ALONE ACTUAL VINDICTIVENESS

The defendant next argues that the government is engaged in a vindictive prosecution that "requires the dismissal of all charges against" him.  Dkt. 8-1 at 21.  The defendant baselessly claims that he "embarrassed the United States government and officials within the United States Department of Justice," and that the government "retaliated" by bringing an "incitement

---

[13]   *See*  https://twitter.com/StevieG54099097/status/1449585683207626756 (last accessed on November 12, 2021).

prosecution" against him in violation of his First Amendment rights. *Id*. Presenting no evidence that even tends to show vindictiveness, the defendant's efforts fall short.

### A.     Vindictive Prosecution Legal Standard

Because "[t]he Attorney General and United States Attorneys retain broad discretion to enforce the Nation's criminal laws," a "presumption of regularity supports their prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) (internal quotation marks and citations omitted). This presumption "rests in part on an assessment of the relative competence of prosecutors and courts." *Id*. at 465. "Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to make." *Id.* (citation omitted); *see also United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) ("[J]udicial authority is … at its most limited when reviewing the Executive's charging determinations" because "the Judiciary … generally is not competent to undertake that sort of inquiry.") (internal quotation marks and citations omitted). This presumption of regularity "also stems from a concern not to unnecessarily impair the performance of a core executive constitutional function." *Id*.

The government cannot, however, engage in vindictive prosecution. "'Prosecutorial vindictiveness' … refers to a situation in which the government acts against a defendant in response to the defendant's prior exercise of constitutional or statutory rights." *United States v. Meyer*, 810 F.2d 1242, 1245 (D.C. Cir. 1987) (citing *United States v. Goodwin*, 457 U.S. 368, 372 (1982)). A defendant may prove prosecutorial vindictiveness one of two ways: submitting (1) evidence of the prosecutor's actual vindictiveness or (2) evidence sufficient to establish a

realistic likelihood of vindictiveness, thereby raising a presumption the Government must rebut with objective evidence justifying its action.  *United States v. Meadows*, 867 F.3d 1305, 1311 (D.C. Cir. 2017) (quoting *United States v. Safavian*, 649 F.3d 688, 692 (D.C. Cir. 2011)).  "If the Government can produce objective evidence that its motive in prosecuting the defendant was not vindictive, then the defendant's only hope is to prove that the justification is pretextual and that actual vindictiveness has occurred."  *Id*.

"To prove *actual* vindictiveness requires objective evidence that the prosecutor's actions were designed to punish a defendant for asserting his legal rights.  Such a showing is normally exceedingly difficult to make."  *Id*. (citing *United States v. Gary*, 291 F.3d 30, 34 (D.C. Cir. 2002)).  "To invoke the *presumption* of vindictiveness, [the Court] must find that a reasonable likelihood of vindictiveness exists—that is, that the [charges were] 'more likely than not attributable to the vindictiveness on the part of' the [g]overnment."  *Id* (quoting *Gary*, 291 F.3d at 34).  Ultimately, to succeed on a claim of vindictive prosecution, a defendant must establish that the charge was "brought *solely* to 'penalize' him and could not be justified as a proper exercise of prosecutorial discretion."  *United States v. Oseguera Gonzalez*, 507 F. Supp. 3d 137, 175 (D.D.C. 2020) (citing *United States v. Slatten*, 865 F.3d 767, 799 (D.C. Cir. 2017)).

The defendant does not cite one case in which a court dismissed the government's initial charging decision based on vindictive prosecution.  That is for good reason: neither the Supreme Court nor the D.C. Circuit Court of Appeals has ever held that the government's initial charging decision amounted to prosecutorial vindictiveness.  Normally, such claims follow a superseding charging document that adds charges to a preexisting criminal case after a defendant exercises a constitutional or statutory right.  *See, e.g., Slatten*, 865 F.3d at 799.  Instead, the defendant's

argument is effectively a First Amendment affirmative defense couched in vindictive prosecution terms.  Regardless, his arguments miss the mark.

### B.    The First Amendment does not protect the defendant's actions

The defendant makes a threshold argument that, when he breached the restricted west Capitol Grounds and east Capitol Steps and led hundreds of other rioters in chants of "USA!" and "1776!" with a megaphone during the Certification of the Presidential Election, he was exercising his First Amendment rights.  He effectively argues that the only way he can be prosecuted under these charges is if he incited imminent lawless action.  Dkt. 8-1 at 19.  This argument is specious, and yanks the rug out from under his entire vindictive prosecution claim.

The Supreme Court has explained the procedure for determining whether a defendant may invoke the First Amendment to challenge a criminal charge.  *Texas v. Johnson*, 491 U.S. 397, 403, (1989).  First, the court must determine whether the defendants' conduct "constituted expressive conduct."  *Id*. (citations omitted).  If the conduct was not expressive, the challenge fails.  Second, if the conduct was expressive, the court must determine if the statute is "related to the suppression of free expression."  *Id*. (citations omitted)  If the statute is not related to the suppression of free expression, the court applies the "less stringent standard" for noncommunicative conduct laid out in *United States v. O'Brien*, 391 U.S. 367, 377 (1968).  *Id*.  If the statute *is* related to the suppression of free expression, the court must apply a "more demanding standard" to determine if the government's interest justifies imposition of criminal liability.  *Id.*  Under *O'Brien*, the statute is constitutional only if (1) "it is within the constitutional power of the government"; (2) "it furthers an important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of free expression"; and (4) "the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest."  391 U.S. at 377.

Rather than argue that the statutes are unconstitutional, the defendant simply takes issue with the government's focus on his speech on January 5 and 6, 2021, arguing that he did not incite lawless action and therefore cannot be prosecuted.  Dkt. 8-1 at 19.

"[T]he Supreme Court has explicitly held that courts *may* consider otherwise-protected speech to establish a defendant's motive or intent during the commission of some other unlawful conduct."  *United States v. Chansley*, 525 F. Supp. 3d 151, 164 (D.D.C. 2021) (citing *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) (holding that the First Amendment "does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent")). Nearly all of the charges require the government to prove some form of intent connected to entering somewhere or impeding or disturbing some proceeding.  Count One charges the defendant with 1752(a)(1), making it illegal to knowingly trespass on certain buildings or grounds when various conditions apply (i.e., when the Vice President of the United States is present).  Count Two charges the defendant with 1752(a)(2), making it illegal to trespass on certain buildings or grounds when various conditions apply and impeding or disrupting government business (and intending to) via disorderly or disruptive conduct.  Count Three proscribes uttering loud, threatening, or abusive language or engaging in disorderly conduct on the Capitol Grounds or Buildings intending to disrupt a session of Congress.  And Count Four prohibits knowingly obstructing or impeding passage through or within the Capitol Grounds or Buildings.  Neither the government's nor the Court's reliance on such evidence is problematic under the First Amendment.

In any event, the defendant's conduct was not "expressive," and thus his claim that incitement is the only avenue toward a legal prosecution fails on its face.  It is uncontroverted that once the defendant entered the Capitol grounds it was his presence and actions, not any "expressive conduct" (or speech) that was unlawful.  The First Amendment does not protect the defendant from

any of the charges he faces in this case just because he was yelling words; his specific "expressive conduct" of saying certain things to others is not the conduct that the statute criminalizes.  To the contrary, it is the defendant's actus reus (presence and physical disturbance loudly leading hundreds of other rioters in chants with a megaphone in the west Capitol Grounds and east Capitol Steps) coupled with his mens rea (intending to disturb the ongoing Certification of the Presidential Election nearby) that violates the various charges at issue.

And, although the defendant did not address any *O'Brien* factors, the governmental interest in protecting the integrity and continuity of Congressional proceedings is unrelated to any incidental impact that the application of the law may have on the ability for the defendant to express himself in restricted grounds.  Notably, the statutes go no further than what is "essential" to prevent disorderly or disruptive conduct in restricted areas and on the Capitol Grounds. The Supreme Court has upheld restrictions on demonstrations in Washington, D.C., with far less at stake than the integrity of the U.S. Presidential Election.  *See Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 299 (1984) (upholding a ban on overnight camping on the National Mall and finding a "substantial Government interest in conserving park property, an interest that is plainly served by, and requires for its implementation, measures such as the proscription of sleeping that are designed to limit the wear and tear on park properties").

### C.     The defendant's remaining cursory arguments also fail to show vindictiveness

The defendant also reasserts without argument that the government "knowingly and intentionally hid from the Court numerous material facts showing that no probable cause exists to prosecute Shroyer."  Dkt. 8-1 at 19.  Assuming the defendant intends to convey that the government withheld evidence to be vindictive, there is one problem with his logic: the government did not withhold any evidence.  As detailed above, the government provided the U.S.

Magistrate Court with active links to all the videos the government relied upon in asserting that there was probable cause to arrest the defendant. Confusingly, the defendant claims the government withheld critical exculpatory evidence, but in the same breath acknowledges (as he must) that the government included the link to the full 22-minute body-worn camera video he repeatedly (and incorrectly) stresses absolves him of any guilt. *See* Dkt. 8-1 at 7 n.2; *see also* Dkt. 1 at 6 n.7. The government even included captions in its photographic exhibits that alluded to some of those around the defendant on January 6 attempting to deescalate the situation. *See* Dkt. 1 at 5 (Figures 2 and 3). Providing the Court with the full videos for its own review hardly amounts to withholding evidence, and certainly does not help the defendant meet the difficult burden required to show vindictive prosecution.

The defendant next posits that the government's interactions with the U.S. Magistrate Court regarding the government's compliance with internal guidelines related to the News Media "lends further support" for supporting his conclusion that the government is vindictively prosecuting him. Dkt. 8-1 at 20. That is where the defendant's argument begins and ends, claiming that the government's "lack of candor raises a serious question as to why the United States is prosecuting Shroyer." *Id* at 20-21. The government's internal deliberations regarding News Media policies under 28 C.F.R. § 50.10, are irrelevant to whether there is probable cause that this defendant committed the charged crimes. More to the point, they do not indicate that the government is acting vindictively by charging him among nearly 700 other individuals for their crimes committed on January 6. Whether the government considers the defendant a member of the News Media or not is wholly disconnected from the government's decision to charge a person who, despite having advanced notice in February 2020 of the boundaries around the Capitol

Grounds and Buildings and warnings not to commit certain acts in those boundaries, nevertheless engaged in the defendant's alleged conduct in January 2021.[14]

## IV.    COUNTS TWO AND THREE ARE NOT MULTIPLICITOUS

Finally, the defendant briefly asserts that the information's counts are multiplicitous.  Dkt. 8-1 at 21-23.  Specifically, he argues that Counts Two (18 U.S.C. § 1752(a)(2)) and Three (40 U.S.C. § 5104(e)(2)(D)) are "virtually identical."  *Id.*  As the defendant's qualification reveals, the counts are *not* identical.

The Double Jeopardy Clause prohibits the "same offense" from being charged in more than one count.  *United States v. Cooper*, 886 F.3d 146, 153 (D.C. Cir. 2018).  But "[i]t is well settled that a single transaction can give rise to distinct offenses under separate statutes without violating the Double Jeopardy Clause."  *Albernaz v. United States*, 450 U.S. 333, 344-45 n. 3 (1981).  The inquiry is "on the statutory elements of the offense.  If each requires proof of a fact that the other does not, the *Blockburger* test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes."  *Iannelli v. United States*, 420 U.S. 770, 785 n.17 (1975); *see also United States v. Mahdi*, 598 F.3d 883, 888 (D.C. Cir. 2010) (quoting *United States v. Weathers*, 186 F.3d 948, 951 (D.C. Cir. 1999); *Blockburger v. United States*, 284 U.S. 299, 304 (1932)).  Indeed, it is irrelevant whether there is significant overlap in the factual proof of each count at trial, or even whether two counts "are based upon the exact same set of facts and circumstances," as long as each count's elements require proof of a fact that the others do not.  *United States v. Manafort*, 313 F. Supp. 3d 311, 314 (D.D.C. 2018); *see id.* ("[T]he test for multiplicity is not

---

[14] For the actual reasons behind the government's decision not to memorialize its internal deliberations in the Complaint, the government provided the U.S. Magistrate Court with a supplemental letter, which the Court included as an attachment to its filing.  Dkt. 3-1.

whether two counts are based on the same set of facts; rather, it is whether the statutory elements of the two offenses are the same.").

The two offenses at issue here, while they may involve similar facts, require different elements of proof, and the distinguishing factor is clear on the face of the statutes. Count Two charges a violation of 1752(a)(2), which requires the government to prove the following four elements:

1)   The defendant engaged in disorderly or disruptive conduct;
2)   The defendant did so knowingly and with intent to impede or disrupt the orderly conduct of Government business or official functions;
3)   The conduct was in, or within such proximity to, a restricted building or grounds as defined in 18 U.S.C. § 1752(c);
4)   It was done when, or so that, such conduct in fact impeded or disrupted the orderly conduct of government business or official functions;

18 U.S.C. § 1752(a)(2). And Count Three charges a violation of 5104(e)(2)(D), which requires the government to prove the following three elements:

1)   The defendant uttered loud, threatening, or abusive language, or engaged in disorderly or disruptive conduct;
2)   The defendant did so willfully and knowingly and with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress, or the orderly conduct in that building of a hearing before, or any deliberations of, a committee of Congress or either House of Congress;
3)   The conduct was at any place in the Grounds or in any of the Capitol Buildings;

40 U.S.C. § 5104(e)(2)(D).

There are at least three readily apparent differences between these two statutes: The *mens rea* ("knowingly" versus "willfully and knowingly"), the statutes' object or affected thing ("restricted building or grounds" versus "any place in the Grounds or in any of the Capitol Buildings"), and 1752(a)(2)'s actual disruption requirement lacking in 5104(e)(2)(D).

On the statutes' objects, 1752(a)(2) applies to conduct at a "restricted building or grounds," defined in 18 U.S.C. § 1752(c), as "any posted, cordoned off, or otherwise restricted area—of the

White House or its grounds, or the Vice President's official residence or its grounds; of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting;[15] or of a building or grounds so restricted in conjunction with an event designated as a special event of national significant."  Whereas the object in 5104(e)(2)(D) is simply "any place in the Grounds or in any of the Capitol Buildings."  In other words, 5104(e)(2)(D) applies to conduct at the Capitol, full stop; 1752(a)(2) *can* apply to conduct at the Capitol but only when certain conditions apply, such as the presence of the Vice President of the United States.

And, as the defendant rightly points out, 1752(a)(2) requires the government to prove that actual disruption occurred, and 5104(e)(2)(D) does not.  But the defendant's attempt to read out the actual disruption element from 1752(a)(2) misunderstands the statutes.  Under 1752(a)(2), the government must prove the defendant engaged in disorderly or disruptive conduct in a restricted area intending to disrupt, done at a time or in such a way that it in fact disrupts.  But, to satisfy 5104(e)(2)(D), all the government must prove is that the defendant engaged in disorderly or disruptive behavior *or* uttered loud, abusive, or threatening language at the Capitol with the intent to disrupt.  The actual disruption element in 1752(a)(2) narrows its applicability to when certain conditions are met (i.e., a government proceeding actually occurring to disrupt), and 5104(e)(2)(D) is free of such limitations, instead focusing broadly on conduct at the Capitol.  And so 1752(a)(2)'s actual disruption element is not superfluous, and Counts Two and Three are not multiplicitous.

---

[15] The term "'other person protected by the Secret Service' means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection."  18 U.S.C. § 1752(c)(2).

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the defendant, Shroyer's Motion to Dismiss Criminal Charges seeking dismissal or a *Franks* hearing be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
DC Bar No. 481052

By: _____
TROY A. EDWARDS, JR.
N.Y. Bar No. 5453741
Kimberly Paschall
Assistant United States Attorneys
555 Fourth Street, N.W.,
Washington, DC  20530
Troy.Edwards@usdoj.gov
(202) 252-7081