IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA                CR No. 1:21-cr-00542-TJK-1

v.                                      Washington, D.C.
                                        Thursday, January 20, 2022
JONATHON OWEN SHROYER,                   10:00 a.m.


                        Defendant.

- - - - - - - - - - - - - - - - - x
_____

                  TRANSCRIPT OF STATUS CONFERENCE
         HELD BEFORE THE HONORABLE TIMOTHY J. KELLY
                 UNITED STATES DISTRICT JUDGE
_____

APPEARANCES VIA VIDEOCONFERENCE:

For the United States:     Kimberly L. Paschall, Esq.
                           U.S. ATTORNEY'S OFFICE
                           555 Fourth Street, NW
                           Washington, DC 20530
                           (202) 252-2650


For the Defendant:         Norman A. Pattis, Esq.
                           PATTIS & SMITH, LLC
                           383 Orange Street
                           1st Floor
                           New Haven, CT 06511
                           (203) 393-3017


Court Reporter:            Timothy R. Miller, RPR, CRR, NJ-CCR
                           Official Court Reporter
                           U.S. Courthouse, Room 6722
                           333 Constitution Avenue, NW
                           Washington, DC 20001
                           (202) 354-3111


Proceedings recorded by machine shorthand; transcript produced
by computer-aided transcription.

1                      **P R O C E E D I N G S**

2           THE DEPUTY CLERK:  We are on the record in

3    Criminal Matter 21-542, United States of America v. Jonathon

4    Owen Shroyer.

5           Present for the Government is Kimberly Paschall;

6    present for the defendant is Norman Pattis; and also present

7    is the defendant, Mr. Shroyer.

8           THE COURT:  All right.  Well, good morning to

9    everyone.

10          We are here for a status conference in this

11   matter.  And I am prepared to rule on the pending motion to

12   dismiss which I thought I would do first and then turn to

13   the parties and see what they wanted to do with the case --

14   check on the status of discovery and talk about where the

15   case goes from here.

16          Does that seem like a reasonable two-step to do

17   today, Ms. Paschall?

18          MS. PASCHALL:  It does, Your Honor.

19          THE COURT:  All right.  Mr. Pattis?

20          MR. PATTIS:  Yes, sir.

21          THE COURT:  Okay.  So I do have pending before me

22   the defendant's motion to dismiss all four counts of the

23   criminal information filed against him.  And I'm going to

24   deny the motion for the reasons I'll now explain.

25          First, let me briefly summarize the procedural

1    history as to how we got here.  On August 19th of last year,

2    the Government filed a criminal complaint with Magistrate

3    Judge Faruqui seeking an arrest warrant of the defendant.

4    That's ECF No. 1.  The complaint was accompanied by a

5    statement of facts prepared by an FBI special agent.  And a

6    few days later, on August 25th, the Government filed a

7    criminal information which is on the docket at ECF No. 5.

8    The defendant is charged with four counts, all misdemeanors:

9    one, 18 United States Code 1752(a)(1), entering and

10   remaining in a restricted building or grounds; two, 18

11   United States Code Section 1745(a)(2) [sic], disorderly and

12   disruptive conduct in a restricted building or grounds;

13   three, a violation of 40 United States Code 5104(e)(2)(D),

14   disorderly conduct in the Capitol grounds; and finally,

15   four, 40 United States Code Section 5104(e)(2)(E), obstruct

16   or impeding passage through or within the Capitol grounds.

17          The defendant filed this motion back in October,

18   the parties have briefed it and argued it before me, and

19   it's ripe for my resolution.  The defendant makes three

20   categories of arguments which I'll address one by one.  He

21   first challenges the validity of the arrest warrant,

22   alleging that the Government withheld or omitted material

23   information in its criminal complaint -- or presented to the

24   magistrate in connection with its criminal complaint in

25   violation of Franks v. Delaware, 438 U.S. 154, of course, a

1   Supreme Court case from 1978.  He next alleges that the

2   charges against him amount to a vindictive prosecution.  And

3   his final argument is that Counts 2 and 3 of the information

4   are duplicative and, therefore, violate his Fifth Amendment

5   protections against double jeopardy.

6        So let me start with the Franks argument; that is,

7   the argument that the Government withheld or omitted

8   material information from the arrest warrant application

9   that, if considered, would have precluded the magistrate

10   from finding probable cause for the arrest.  Specifically,

11   the defendant alleges that the Government withheld video

12   evidence filmed on January 6th showing that the defendant

13   actually attempted to de-escalate tensions at the Capitol on

14   that day and that he had no knowledge that he was on

15   restricted grounds, which he argues is a requirement shared

16   by all four counts of the information.  The defendant claims

17   that he -- that the allegedly admitted -- that the allegedly

18   omitted evidence is material enough that if the magistrate

19   had consider it -- considered it, the probable cause

20   calculus would have come out in his favor; that is, the

21   magistrate would have found no probable cause.

22        The Supreme Court held in the Franks case I just

23   mentioned that when, quote, A defendant makes a substantial

24   preliminary showing that a false statement knowingly and

25   intentionally, or with reckless disregard for the truth, was

1    included by the affiant in the warrant affidavit, and if the

2    allegedly false statement is necessary to the finding of

3    probable cause, the Fourth Amendment requires that a hearing

4    be held at the defendant's request.  That's Franks at 155

5    through 56.  And if, after a hearing, the court determines

6    that the false statement was necessary for the probable

7    cause determination, the warrant must be voided.

8              In order to obtain a Franks hearing, the

9    defendant, quote, Must show that, one, the affidavit

10   contained false statements; two, the statements were

11   material to the issue of probable cause; and, three, that

12   the false statements were made knowingly and intentionally

13   or with reckless disregard for the truth.  That's a D.C.

14   Circuit case that I'm quoting there, United States v.

15   Becton, 601 F.3d 588 at 594.  It's a D.C. Circuit case from

16   2010.  Now -- and although Franks only mentions false

17   statements, as we all know, material omissions can be

18   considered for the first part of that test.  And I'll cite

19   United States v. Williams, 827 F.3d 1134 at 1146, a D.C.

20   Circuit case from 2016.  But to obtain a Franks hearing, the

21   alleged omission must be material enough to alter the

22   court's conclusion that the probable cause standard was met.

23   That's the Williams case, again, at 1146.

24             So let me out- -- at this point, outline what the

25   defendant alleges the Government omitted or withheld.

1      First, the defendant argues that the Government did not

2      include or -- did not include or attempted to conceal

3      important pieces of private bodycam footage from an

4      individual traveling with the defendant on January 6th that

5      purportedly shows that the defendant was complying with law

6      enforcement directives.  The defendant also argues that the

7      Government omitted two videos posted to Twitter -- that were

8      neither filmed by nor depict the defendant -- that show --

9      allegedly show defendant's lack of knowledge that he was in

10     a restricted area.  That's ECF No. 8-1 at Pages 7 through 9.

11          So in my view, the defendant falls short at the

12     first step of the three-step test articulated in the Becton

13     case.  The Government did not omit -- truly omit or withhold

14     anything at all.  The Government provided the magistrate a

15     link to the publicly available video in its entirety.

16     That's ECF No. 1-1 at Page 6, Note 7.  And defense counsel

17     confirmed this at oral argument on the motion last time we

18     were all together, albeit arguing that certain parts of that

19     video should have been specifically excerpted for the

20     magistrate.  But, in fact, the Government appears to have

21     provided links to every video referenced in the criminal

22     complaint.

23          At oral argument last month, I -- counsel took a

24     slightly different tack, narrowing his argument to suggest

25     that the Government's failure to highlight specific portions

1    of the bodycam footage is effectively an omission, an

2    omission that was designed to misdirect the magistrate.  And

3    I disagree with that argument at least on this record.

4    True, there might be a problem if the magistrate or judge,

5    in issuing a warrant, was misled by information in an

6    affidavit or that the affiant knew was false or as a result

7    of the affiant's reckless disregard for the truth.  That's

8    United States v. Spencer, 530 F.3d 1003, a D.C. Circuit case

9    from 2008 that quotes the United States v. Leon Supreme

10   Court case, 468 U.S. 897, a Supreme Court case -- at 923,

11   and it's a Supreme Court case from 1984.  But the

12   Government's description of what it sees as the important

13   part of a publicly available video -- along with providing

14   the entire video to the magistrate -- hardly constitutes an

15   effort to mislead the court.  In fact, it is hardly an

16   omission at all.

17          The defendant also argues that the Government

18   omitted important video evidence showing that police

19   officers removed barriers and invited individuals closer to

20   the Capitol, thus showing that the defendant had no

21   knowledge that he was in a restricted area.  That's ECF No.

22   8-1 at 9.  The defendant provides links to two videos posted

23   to Twitter.  But the defendant does not argue that he took

24   these videos, that he's depicted in these videos, or that he

25   has some other connection to them.  That's ECF No. 8-1 at 9

1    and Notes 3 and 4.  And defense counsel confirmed at oral

2    argument that these two videos were posted and filmed by

3    someone with no apparent link to the defendant.

4            Two videos are -- under 15 seconds each -- again,

5    no alleged -- with no alleged connection to the defendant --

6    do not suggest that the Government omitted information from

7    its complaint.  There are hundreds, if not -- or from the

8    material supporting the complaint.  There are hundreds, if

9    not thousands, of videos of January 6th events.  And it

10   doesn't seem to me that the Government should be expected to

11   submit every video of the events that day, especially videos

12   without a specific -- any specific connection to this

13   defendant.  Putting aside that the parties dispute exactly

14   what the videos show, the fact that the Government did not

15   include these videos in its warrant application does not

16   conclude -- that -- does not truly constitute an omission,

17   material or otherwise.

18           But I'll now turn to the second part of the test:

19   that the alleged omitted content must be material to the

20   probable cause analysis.  So even assuming we want to

21   consider the -- that the information that we're discussing

22   here -- even if we considered it an omission, I don't

23   believe the defendant's established that, if it was

24   considered, the omitted facts would materially alter the

25   analysis to compel a determination that probable cause did

1     not exist.  In other words, the defendant cannot show that

2     the magistrate -- had the magistrate considered what the

3     defendant alleges is in the bodycam video and the two

4     Twitter videos, that the magistrate would necessarily have

5     determined that probable cause was lacking.

6               To begin, the Federal Rules of Criminal Procedure

7     require a judge to issue an arrest warrant when a criminal

8     complaint establishes that offense -- that an offense had

9     been committed and that the defendant committed it.  And

10    that's Rule of Criminal Procedure 4(a).  Probable cause to

11    arrest exists only if, quote, A reasonable and prudent

12    officer would conclude from the totality of the

13    circumstances that a crime has been committed.  That's

14    United States v. Holder, 990 F.2d 1327 at 1328, a D.C.

15    Circuit case from 1993.  And the Supreme Court has noted

16    that probable cause is, quote, A practical, non-technical

17    conception, closed quote, that turns, quote, On the

18    assessment of probabilities in particular factual contexts,

19    closed quote.  That's Maryland v. Pringle -- a cleaned-up

20    quote from Maryland v. Pringle, 540 U.S. 366 at 370 through

21    371.  It's a Supreme Court case from 2003.  And, of course,

22    I'll note that great deference is afforded the magistrate's

23    determination.  That's the D.C. Circuit in United States v.

24    Spencer, 530 F.3d 1003 at 1006.  Considering the contents of

25    the complaint and the supporting affidavit -- along with any

1    allegedly omitted material -- there is no doubt in my mind

2    that probable cause for an arrest existed here.  So let me

3    just make four points on that issue.

4            First, the bodycam footage itself -- the link to

5    the full 22-minute video is found at Footnote 7 of the

6    Government's warrant application -- does not undermine the

7    magistrate's conclusion.  In fact, taken as a whole, it

8    supports a finding of probable cause.  More specifically,

9    the footage supports the magistrate's conclusion that there

10   was probable cause to believe the defendant entered

11   restricted grounds and that he knew he was not allowed to be

12   there.  And so just -- let me just mention a few things the

13   video does depict:

14           Officers guarding the perimeter of the Capitol,

15   deploying crowd control measures such as smoke or tear gas.

16           It shows that -- the video also depicts the

17   defendant's group marching over caution tape on the ground

18   and a sign that says "AREA CLOSED."

19           It depicts officers directing the defendant's

20   group away from the Capitol, referring to, quote, The hole

21   that you guys breached right there, closed quote.

22           The officers never speak directly to the

23   defendant, refer to the defendant by name, or directly ask

24   for the defendant's help with the crowd -- with any crowd

25   control situation.  In fact, when the individual wearing the

1   bodycam asks about permission for another individual in

2   defendant's group to go on the Capitol steps, an officer

3   says, I'm not authorized -- quote, I'm not authorized to do

4   that, closed quote.

5           And after failing to get permission for members of

6   the group to address the crowd, the individual wearing the

7   bodycam states, quote, Just get him up here?  We know he

8   might catch a bang or two, closed quote.

9           At this step, the defendant must show that when

10  considering all the relevant information, including anything

11  allegedly omitted, the probable cause analysis would have

12  come out in his favor.  And I don't think he's shown that.

13  As I just said, a, sort of, holistic review, if you will, of

14  the bodycam footage, I think, supports the magistrate's

15  conclusion.  Certainly, it doesn't fatally undermine it.

16  The overwhelming police presence in the footage involving

17  protective perimeters, riot control postures, and tear gas

18  is unmistakable.  Taken together with the fact that law

19  enforcement officers attempted to direct the defendant's

20  group away from the Capitol, I think a reasonable and

21  prudent magistrate could conclude that the defendant entered

22  restricted grounds and knew he was not allowed to be there.

23  To be clear, the defendant is, of course, free to argue

24  about what the video depicts in particular places and,

25  obviously, present other evidence he thinks will help him as

1    this case moves forward.  But at this juncture, he's not

2    shown that the complete bodycam video was material to the

3    determination of probable cause, which I -- which I'll note

4    is a modest bar to clear.

5              Second -- so that -- those are my comments on the

6    totality of that bodycam video.

7              The other two alleged omissions here are the two

8    Twitter videos.  And, again, the defendant argues that the

9    videos show law enforcement officers removing barriers and

10   waving in protesters toward the Capitol and, therefore, that

11   he could have not -- and that -- therefore, that the

12   defendant could not have known he was on restricted grounds.

13   The Government argues that the officers were waving to other

14   officers for assistance.  I don't think I need to resolve

15   these dueling characterizations of what the videos show.

16   What matters most is that these videos have no direct

17   connection to the defendant that anyone has been able to

18   point to me.  Without some alleged link between these videos

19   and the defendant's conduct or the circumstances on January

20   -- or his circumstances on January 6th, it's hard to

21   conclude that these two Twitter videos would materially

22   alter the probable cause analysis.

23             And my conclusion on the immateriality of these

24   two alleged omissions is bolstered by other evidence in the

25   warrant application that supported probable cause.  The

1    Government described, and provided a link to, a video in

2    which the defendant -- reporting from the Capitol in real

3    time -- calls into a news show on January 6th.  And the

4    defendant states, There's probably 1,000 -- 100,000 people.

5    They've taken the Capitol grounds.  They've surrounded the

6    building itself.  They're on the actual building structure.

7    We literally own these streets right now.  ECF -- that's ECF

8    No. 1-1 at 4, Note 5.  Again, that the defendant himself

9    used words such as "taken the Capitol grounds" and described

10   folks as being on the building itself, I think, further

11   supports the magistrate's conclusion.

12          The Government's -- the complaint and information

13   submitted with the complaint also contains information about

14   the defendant's prior deferred prosecution agreement, which

15   relates to a charge under D.C. law concerning disorderly and

16   disruptive conduct on Capitol grounds.  I know the parties

17   spent a lot of time on this at oral argument, but to the

18   extent that the defendant argues he did not know what was

19   and was not a restricted area, the fact that he signed a

20   deferred prosecution agreement outlining in detail what

21   constitutes Capitol grounds does tend to undercut that

22   argument.

23          So in sum, nothing material -- I can't conclude

24   that anything material was admitted from -- was omitted from

25   the warrant application, and certainly nothing -- well,

1    nothing material was omitted from the warrant application,

2    and so there is no need for me to order a Franks hearing.

3         The second argument was that the charges against

4    the defendant were vindictive and retaliatory and,

5    therefore, should be dismissed.  ECF No. 1- -- 8-1 at 18.

6    The defendant argues that he holds political views the

7    Government dislikes and that the case was brought in

8    response to the defendant exercising his constitutionally

9    protected First Amendment rights.

10        So to establish vindictive prosecution, the

11   defendant must submit either, one, evidence of the

12   prosecutor's actual vindictiveness; or, two, evidence

13   sufficient to establish a realistic likelihood of

14   vindictiveness.  That's the D.C. Circuit in United States v.

15   Safavian, 649 F.3d at -- 688 at 693.  This is an exacting

16   standard.  To succeed on a claim of vindictive prosecution,

17   the defendant must show that the Government brought the

18   charge, quote, Solely to penalize him and could not be

19   justified as a proper exercise of prosecutorial discretion,

20   closed quote.  United States v. Slatten, 865 F.3d 767 at

21   799, a cleaned-up quote from that case, a D.C. Circuit case

22   from 2017.

23        The defendant does not meet this high bar.  He has

24   little, if any, evidence here suggesting vindictiveness.  As

25   I suggested earlier, he has not shown that any material that

1  would have materially affected the magistrate's decision was

2  omitted.  And that itself undermines a claim that the

3  charges here were brought solely because the defendant

4  exercised his First Amendment rights.  The Supreme Court has

5  made clear in a related context that a party pressing a

6  retaliatory arrest claim must prove the absence of probable

7  cause for the arrest.  That's Nieves v. Bartlett, 139

8  Supreme Court 1715 at 1725, a Supreme Court case from 2019.

9  And the defendant has certainly not done that.

10        Nor do the four crimes that the defendant is

11  charged with turn on the content of the defendant's

12  potentially expressive actions, which may or may not be

13  covered by the First Amendment.  In criminal proceedings,

14  the Government can point to protective -- protected speech

15  in order to establish elements of a crime.  For example,

16  that the defendant interrupted governmental proceedings.

17  See Wisconsin v. Mitchell, 508 United States 476 at 489,

18  a -- Supreme Court from 1993.  For this reason, I don't need

19  to determine if the defendant engaged in constitutionally

20  protected speech on January 6th to resolve this motion.

21  Even if he did, the Government is still allowed to use what

22  he said to establish the elements of a crime.  And doing so

23  here is not evidence of a vindictive prosecution.

24        To the extent that defendant claims that the

25  Government's concealment of exculpatory information

1    establishes a likelihood of vindictiveness, that argument

2    fails, too, given my conclusion that the Government did not

3    omit any information at all, material or otherwise.  And to

4    the extent that defendant argues that the Government could

5    have pursued criminal action under D.C. law and the

6    defendant's deferred prosecution agreement, that does little

7    to establish vindictive prosecution.  The fact that the

8    Government may have been able to bring charges pursuant to

9    the DPA but elected not to, or at least at this point has

10   elected not to, does not establish one way or the other --

11   it does not establish a realistic likelihood of

12   vindictiveness here.

13          Turning to the third argument, which I think is

14   actually the easiest to resolve, Counts 2 and 3 of the

15   information -- the defendant argues that Counts 2 and 3 of

16   the information are multiplicitous and, therefore, violate

17   his First Amendment protections -- I'm sorry, his Fifth

18   Amendment protections against double jeopardy.  The answer

19   here is straightforward.  Generally, the Double Jeopardy

20   Clause prohibits the same offense from being charged in

21   multiple counts in order to avoid, quote, Multiple

22   punishments for the same offense.  That's United States v.

23   Mahdi, 598 U.S. 883 at 887, a D.C. Circuit case from 2010.

24   But in that same case, the Circuit instructed that the same

25   acts can give rise to charges under distinct criminal

1    statutes so long as, quote, Each provision requires proof of

2    a fact which the other does not.  That's Mahdi at 888.  The

3    focus here is on whether the statutory elements of the

4    crimes require different facts to be proven, even if the

5    same events gain rise -- gave rise to both charges.

6         The most obvious difference between the elements

7    of these counts is that Count 2 -- 18 United States Code

8    1752(a)(2) -- requires that the defendant's conduct, quote,

9    In fact, impeded or disrupted qualifying government

10   activity, whereas Count 3 -- 40 United States Code Section

11   5104(e)(2)(D) -- only requires that the defendant undertook

12   certain action with, The intent to impede, disrupt, or

13   disturb, quote [sic], certain congressional activity.  The

14   Government needs to prove particular facts for the 17- --

15   for the 7 -- Section 1752 charge that it does not need to

16   prove for the 5104 charge; namely, that the Government --

17   that the defendant's conduct actually impeded or disrupted

18   certain government activity.

19        In addition, the location of the conduct that each

20   statute covers differs.  Section 1752(a)(2) applies, among

21   other ways, to any grounds where certain qualifying

22   individuals may be, quote, Temporarily visiting, closed

23   quote.  But Section 5104(e)(2)(D) covers conduct, quote, In

24   the grounds or in any of the Capitol buildings, closed

25   quote.  Of course, the same location might be sufficient for

1     both offenses in a particular case, but Section 1752

2     requires something additional: that a qualifying individual

3     is temporarily visiting that area at the time of the alleged

4     conduct.

5               At bottom, the Government may be able to prove the

6     elements of both crimes with the same facts and/or evidence.

7     But the elements of each statute require different facts to

8     be proven.   Therefore, it is black-letter law that the two

9     charges are not multiplicitous, and the complaint does not

10    run afoul of the Double Jeopardy Clause.

11              So for all those reasons, I will deny

12    Mr. Shroyer's motion.

13              I don't know if the parties have had a chance -- I

14    mean, obviously, we've had a little bit of an uptick in the

15    virus both nationally and here in the District of Columbia,

16    and I don't know if the parties have talked about, kind of,

17    whether they want a little space to -- either for

18    negotiation purposes or for -- in order to make sure that

19    the defendant has all the discovery he needs.   But,

20    Ms. Paschall, why don't you give me an update on where

21    things are in that regard.   I know that -- and I say this

22    all by way of acknowledging, I know that Mr. Pattis had

23    indicated he wanted, you know -- he wanted a trial date on

24    a -- on the quicker side, but, obviously, we've had a little

25    bit of a wrench thrown into the machine here with the

1    current state of affairs and I wondered if the parties had

2    talked about, sort of, a game plan for moving forward.

3            MS. PASCHALL:   Thank you, Your Honor.

4            We have not been able to connect about a game

5    plan, but I can update the Court that we have made all of

6    the global January 6th case discovery disclosures to the

7    defense in this matter as well as case-specific disclosures

8    have been made this week with regards to what the Government

9    has in its possession, custody, and control at this time.

10           As I'm sure Your Honor is aware, but I'll also say

11   it for the benefit of defendant and defense counsel in this

12   matter, the global January 6th discovery is ongoing.  We are

13   at the point now where we are trying to move from the USAfx

14   database, which only has the ability to -- for us to

15   disclose certain sizes and types of discovery, to a

16   Relativity database which will allow the Government to make

17   larger disclosures such as larger videos, downloads of a

18   defendant's social media, devices, things of that nature.

19   So my discovery team and my office has been working with the

20   FPD to set up that Relativity database for the defense

21   instance.  We have been making productions to that database,

22   but defense counsel are not yet able to access it.  So

23   functionally, you know, it's not quite the same as them

24   having the access to those larger productions, but I know

25   the FPD is working on it and we expect to have that up and

1   running soon.

2           So it's hard for the Government to say in each

3   individual case what defense needs in terms of timing once

4   accessing all of that information with respect to the Speedy

5   Trial Act and whether they want to, you know, push forward

6   with their speedy trial rights.  The Government, of course,

7   is willing to engage in discussions about dispositions short

8   of trial with the defense in this case; however, given that

9   most of the discovery has just recently been disclosed

10  because we just got the protective order in place subsequent

11  to the last hearing that we had last month, I would assume,

12  but don't want to presume, that defense may need additional

13  time in order to review that before coming to the table of

14  whether or not they want to even engage in plea discussions,

15  but the Government is open to that.

16          I can also give Your Honor an update.  The

17  Superior Court matter with the deferred prosecution

18  agreement is currently trailing this matter.  I believe

19  they're set to go before the court there on February 7th,

20  but it's my understanding from the docket there that they're

21  simply trailing our matter.

22          THE COURT:  All right.  And it's -- the Government

23  is not -- I mean, I don't know that it really matters from

24  my perspective, but the Government is, sort of, waiting to

25  see what happens here; is not pressing forward with any

1    action on that case until this plays out.  Is that fair or

2    you're not sure?

3                MS. PASCHALL:  I am sure.  And it's somewhat fair

4    but procedurally slightly different.  My understanding is

5    that the Superior Court AUSA actually did move to revoke the

6    agreement there, but there was litigation done on that issue

7    and the judge is holding their decision in abeyance --

8                THE COURT:  I see.

9                MS. PASCHALL:  -- until we are --

10               THE COURT:  Okay.

11               MS. PASCHALL:  -- complete here.  So functionally,

12   yes; procedurally, slightly different.

13               THE COURT:  Right.  But not because that's the

14   Government's posture.  That's just the way the judge is

15   handling it there.

16               MS. PASCHALL:  Correct.

17               THE COURT:  All right.  Mr. Pattis, where -- well,

18   before I turn to you, Mr. Pattis, let me ask Government

19   counsel one more question.

20               So just so I understand, you made a bunch of

21   representations about the Relativity database and how it's

22   coming and all the rest, but I think you also said that

23   you've made all those productions to defense counsel in this

24   case, both case-specific and global.  So that's -- you mean

25   to say you've provided it on disc or some other format where

1    it's, maybe, not as usable or searchable or accessible as it

2    ultimately will be for Relativity but that you've actually

3    produced it, even if it's in a less -- or potentially less

4    -- I don't know -- a less accessible form; is that fair?

5            MS. PASCHALL:  Almost.  We have produced

6    everything that we have the ability to produce on the

7    USAfx --

8            THE COURT:  I see.

9            MS. PASCHALL:  -- system.  There are --

10           THE COURT:  I see.

11           MS. PASCHALL:  -- like, size gaps.  I think it can

12   only handle up to a certain number of gigabytes.  So things

13   like downloads of other defendants' phones, social media

14   accounts, videos that are larger than that size have not yet

15   been produced because functionally, we can't make that

16   happen on the USAfx system.  So we're moving to the

17   Relativity system in order to accommodate that, and also, as

18   Your Honor notes, for, kind of, ease of review.  The

19   Relativity system has much more ability for filtering and

20   things of that nature.  So everything that the Government

21   has produced in the January 6th cases up to this point and

22   everything that the Government has in its possession,

23   custody, and control with respect to this defendant has been

24   produced on USAfx; however, there are more global

25   disclosures that should be made on the Relativity instance

1    once that gets up and running.

2              THE COURT:  All right.  And is it the Government's

3    position that Relativity's the only way to make those

4    productions or -- I mean, I -- maybe, this is going to be

5    driven by -- a little bit by the defense posture here, but

6    -- well, yeah.  Why don't I just see -- check in with

7    Mr. Pattis.

8              Mr. Pattis, what -- it sounds like, again, you'd

9    only gotten a lot of this discovery fairly recently since we

10   were last together.  So I'm sympathetic to your desire to

11   want to push forward, but I want to do it in a way that,

12   like, makes sense.  So what's your -- one possibility is we,

13   sort of, tread water until one -- for one more status to,

14   sort of, give you a chance to look at what you've got and

15   see if you think we're going to be further litigating things

16   and then when we come back, maybe, we're in a better

17   position as far as the pandemic goes and I'll have a little

18   more clarity about when I could set you all, but I want to

19   hear from you.

20             MR. PATTIS:  I don't recall the date of our last

21   meeting, sir, but the last 45 days or so, there's been a

22   significant detour in the case involving the congressional

23   committee --

24             THE COURT:  Okay.

25             MR. PATTIS:  -- and its attempts to -- its --

1    subpoena or interview associates of Mr. Shroyer's, people --

2            THE COURT:  Oh.

3            MR. PATTIS:  -- (inaudible) -- whom he was present

4    at the Capitol, and there have been extensive negotiations

5    there and we have prepared not Mr. Shroyer but people

6    associated with him and who have a unity of interest, in my

7    view; compliance with the subpoena, but we've -- we have

8    elected to assert the Fifth Amendment privilege and seek

9    relief in the courts on separation of powers grounds.

10   Paradoxically, that may not be a position that we take with

11   the executive branch.  And so I mean to have a discussion

12   with him about that later today.  I just returned from

13   Austin last night.  And we have a proposal on behalf of

14   Mr. Shroyer to advance the litigation that might be of

15   interest to the Government.  So punting makes sense for

16   reasons that are related to the case but may or may not be

17   admissible in what you would hear in any conceivable trial.

18            So -- and a second issue, Judge, incident to the

19   January 6th committee, I've spent a lot of time looking at

20   the case of Pete Santilli, who was a journalist covering the

21   Bundy incident, and his use of Wisconsin v. Mitchell to

22   thread the line of what was permitted and what was

23   prohibited.  And would you consider a motion to reconsider

24   what -- that raised an additional First Amendment argument

25   or should I save that for an MJOA at trial?  Because in the

1    Santilli case, you know -- you'll recall the Bundy standoff

2    out west involving --

3           THE COURT:  I do.

4           MR. PATTIS:  -- (inaudible) -- and whatnot, and

5    Santilli was a blogger/activist and he ended up getting

6    charged and tried to assert a First Amendment defense.  His

7    conduct was remarkably different than that alleged against

8    Mr. Shroyer.  I mean, he was driving a car at agents,

9    blocking --

10           THE COURT:  Right.

11           MR. PATTIS:  -- a barricade.  And it's, kind of,

12    hard to say, Hi, I'm CNN.  Freeze, you know?

13           THE COURT:  Right.

14           MR. PATTIS:  I'm -- and so that -- there are

15    arguments that -- and -- that we did not assert that I'd

16    like an opportunity to do so, but I don't want to multiply

17    the proceedings.

18           THE COURT:  Well, that sounds like an entirely,

19    really, different argument in the sense that it's really

20    just flat grounded in the First Amendment as opposed to

21    vindictive prosecution or any of the other, sort of,

22    conceptual baskets you already argued.  So --

23           MR. PATTIS:  It is --

24           THE COURT:  -- I don't know that it --

25           MR. PATTIS:  (Inaudible.)

```
 1              THE COURT:  I'm not even sure it's a motion to

 2   reconsider so much as it's a new argument to dismiss; is

 3   that --

 4              MR. PATTIS:  I think you're right.  I just don't

 5   -- yeah, it is fair.  I was just trying to --

 6              THE COURT:  Yeah.

 7              MR. PATTIS:  -- shoehorn it in with, you know --

 8              THE COURT:  Right.

 9              MR. PATTIS:  -- you know --

10              THE COURT:  No, I hear you.

11              MR. PATTIS:  -- just to cover my flank, sir.

12              THE COURT:  I understand.  I think -- look, I'm

13   open -- I'm certainly open to that, especially since I think

14   it's a new argument and I, you know -- it's not surprising

15   to me that, frankly, you're raising a First Amendment issue.

16   And, again, you filed your motion.  It wasn't because I set

17   a deadline for you.  So I, you know -- you weren't

18   responding to a scheduling order that I had set a date for

19   dispositive motions.  So I think I'm -- I don't think you're

20   -- you -- I'm not going to prohibit you from --

21              MR. PATTIS:  Thank you.

22              THE COURT:  -- filing something else, but I think

23   it sounds like, given all the -- and I don't think you're

24   going to disagree with what I'm about to say -- but it

25   sounds like, given the other issues you have on your hands,
```

```
1    that it might be something we come back to if -- once I give

2    you, maybe -- punting for some other piece of time for you

3    to work out these other issues and see where we stand on the

4    end of them, issues --

5              MR. PATTIS:  And --

6              THE COURT:  -- that don't have anything directly

7    to do with this criminal case but sounds like are both --

8    where both of the parties' interests are at stake.

9              MR. PATTIS:  Thank you.  And I should note that in

10   terms of COVID, I tested positive this morning.  The good

11   news is it feels like no more than a cold, but I just found

12   out.  So I'm going to take it easy for a week and see what

13   happens next, you know?

14             THE COURT:  Mr. Pattis, I hope you have a speedy

15   recovery, and I'm sure --

16             MR. PATTIS:  I'm sure I will.

17             THE COURT:  -- you will.

18             MR. PATTIS:  Yeah, I'm sure I will.  Yeah.  Only

19   the good die young, Judge, and I'm too old.  I already

20   missed the threshold.

21             (Laughter.)

22             THE COURT:  All right.  So you all know better

23   than I do about things going on, kind of, outside the realm

24   of my virtual courtroom and what amount of time would make

25   sense.  I don't know.  Mr. Pattis, why don't I ask you.  It
```

1    sounds to me like -- I don't know.  My -- but so let me ask

2    you.  Forty-five days?  Sixty days?

3              MR. PATTIS:  I was going to ask for 30.

4    Forty-five or 60 would be great.  I mean, I'm, you know -- I

5    would say 45, because I know Mr. Shroyer is anxious to

6    conclude --

7              THE COURT:  Right.

8              MR. PATTIS:  -- (inaudible) -- and that would

9    permit me to have meaningful discussions with the Government

10   here; resolve some issues with the congressional committee;

11   and, maybe, find a way to resolve all of this, you know?  So

12   --

13             THE COURT:  All right.  I, you know -- again, like

14   you said, I'm trying to weigh an amount of time that

15   respects Mr. Shroyer's desire to push forward, and also,

16   gives you all enough time, and particularly what you just

17   mentioned about your health status and you might want to --

18   you probably are going to take it easy for a little while.

19             Ms. Paschall, is that acceptable to you?

20   Forty-five days.

21             MS. PASCHALL:  That's fine, Your Honor.  The

22   Government would move to exclude any time under the Speedy

23   Trial Act calculations in that time frame, but we're

24   amenable to any time that is available to the Court and

25   defense.  I guess we're looking at late February, early

1    March.

2              THE COURT:  Ms. Harris, can you give me a date --

3    what's a date 45 days out?

4              THE DEPUTY CLERK:  Forty-five days is Sunday,

5    March 6th.  So Monday, March 7th.

6              THE COURT:  I have March 6th as a Sunday.

7              THE DEPUTY CLERK:  Yeah --

8              THE COURT:  Oh, I see.

9              THE DEPUTY CLERK:  -- (inaudible) -- for March

10   7th.

11             THE COURT:  Oh, understood.  Right.  So we could

12   do it anytime in there.  In fact, looking at a -- what I'd

13   ask -- what I'd suggest, looking at the calendar, is to do

14   it March 8th at, oh, let's say, 2:30 p.m.

15             Is that -- is -- are you available, Government

16   counsel, then?

17             MS. PASCHALL:  Would Your Honor be amenable to

18   3:00 o'clock?  I have a sentencing hearing that may take a

19   little bit of time before Judge Friedrich that I think is

20   scheduled for 1:30 and it --

21             THE COURT:  Okay.

22             MS. PASCHALL:  -- may be in person.  So if Your

23   Honor's amenable to 3:00 p.m., that would be fine.

24             THE COURT:  3:00 p.m., then.

25             Mr. Pattis, is that available to you?

1          MR. PATTIS:  Yes, sir.

2          THE COURT:  Okay.  And, Mr. Pattis, given the

3     discovery issues and the issues you identified, I assume

4     your client would be willing to waive speedy trial until

5     that date only.

6          MR. PATTIS:  Yes.

7          THE COURT:  All right, then.

8          I will find the time between today's date and

9     March 8th is excludable under the Speedy Trial Act because

10    the ends of justice that are served by taking such action

11    outweigh the best interests of the public and the defendant

12    in a speedy trial.  I'm doing so to give the defendant the

13    continued opportunity to review the discovery that's been

14    relatively recently produced to him; to -- for Mr. -- for he

15    and Mr. Pattis to discuss that discovery; and for the

16    parties to, as they've both indicated, engage in

17    negotiations that could resolve this case and that relate to

18    other governmental proceedings.

19         So we'll come back March 8th at 3:00 o'clock p.m.

20         Anything further, then, from the Government today?

21         MS. PASCHALL:  No, Your Honor.  Thank you.

22         THE COURT:  All right.  Anything further from you,

23    Mr. Pattis?

24         MR. PATTIS:  No, sir.

25         THE COURT:  All right.  Mr. Pattis, get well soon.

1           And we will -- we'll see you in -- we'll see you

2      all in early March.  Until then --

3           MR. PATTIS:  Yes, sir.  Thank you.

4           THE COURT:  -- the parties are dismissed.

5           MR. PATTIS:  Thank you, sir.

6           MS. PASCHALL:  Thank you, Your Honor.

7           (Proceedings concluded at 10:53 a.m.)

8                     * * * * * * * * * * * *

9              **CERTIFICATE OF OFFICIAL COURT REPORTER**

10     **I, TIMOTHY R. MILLER, RPR, CRR, NJ-CCR, do hereby certify**

11     **that the above and foregoing constitutes a true and accurate**

12     **transcript of my stenographic notes and is a full, true and**

13     **complete transcript of the proceedings to the best of my**

14     **ability, dated this 27th day of January 2022.**

15                          **/s/Timothy R. Miller, RPR, CRR, NJ-CCR**
                         **Official Court Reporter**
16                         **United States Courthouse**
                         **Room 6722**
17                         **333 Constitution Avenue, NW**
                         **Washington, DC 20001**

18

19

20

21

22

23

24

25