**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 21-cr-542 (TJK)** |
| **v.** | : | |
| | : | |
| **JONATHAN OWEN SHROYER,** | : | |
| | : | |
| **Defendant** | : | |

### GOVERNMENT'S SENTENCING MEMORANDUM

In the months prior to January 6, Shroyer spread election disinformation paired with violent rhetoric to hundreds of thousands, if not millions, of viewers. He presciently warned in November 2020 that, if Joe Biden became president, "it's not going to be a million peaceful marchers in D.C." And, on January 6, 2021, Shroyer took to a megaphone before leading a crowd to the Capitol: "The Democrats are posing as communists, but we know what they really are: they're just tyrants, they're tyrants. And so today, on January 6, we declare death to tyranny! Death to tyrants!" Shroyer did not stop at the sight of tear gas or sounds of explosions on the west side of the Capitol. He continued marching around to the top of the east steps chanting "1776!," where rioters would eventually violently breach the Capitol and its police line and halt the transfer of presidential power. Shroyer did not step foot inside the Capitol, he did not need to; many of those who listened to him did instead. In the aftermath, he has blamed "Antifa" and told his followers: "We should have been proud of what happened."

Shroyer helped create January 6. The government respectfully requests that this Court sentence him to 120 days of incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution.

## I.      Introduction

Jonathon Owen Shroyer, host on the internet streaming program "The War Room" for the company InfoWars, enthusiastically participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of Congress's certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

Shroyer pleaded guilty to one count of violating 18 U.S.C. 1752(a)(1). As explained herein, a sentence of incarceration is appropriate in this case because Shroyer: (1) had an active order to stay away from the U.S. Capitol and its grounds on January 6, 2021 due to a pending case for disorderly conduct on those grounds; (2) stoked the fire of hundreds of thousands of his followers with violent rhetoric and disinformation about the election leading up to January 6 and during a march he helped lead to the restricted grounds, and (3) praised the actions of the rioters at the Capitol after January 6 on his online streaming show.

The Court must also consider that Shroyer's conduct on January 6, like the conduct of hundreds of other rioters, took place in the context of a large and violent riot that relied on numbers to overwhelm police officers who were trying to prevent a breach of the Capitol Building, and

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

disrupt the proceedings. Here, the facts and circumstances of Shroyer's crime support a sentence of 120 days incarceration in this case.

## II.      Factual and Procedural Background

### *The January 6, 2021 Attack on the Capitol*

To avoid unnecessary exposition, the government refers to the general summary of the attack on the U.S. Capitol. *See* ECF 39 (Statement of Offense), at 1-3.

### *Defendant Shroyer's History of Unlawful Activity at the U.S. Capitol*

A year before Shroyer's unlawful actions at the Capitol on January 6, 2021, Shroyer was arrested on December 9, 2019, in Washington, D.C., after disrupting a House Judiciary Committee meeting in the Longworth House Office Building by jumping out of his seat and shouting in a loud manner. *See* Dkt. 1 (citing Case Num. 2020 CMD 000820). On January 17, 2020, prosecutors charged Shroyer by a Criminal Information in the Superior Court of the District of Columbia with (1) Disorderly and Disruptive Conduct on United States Capitol Grounds, in violation of 10 D.C. Code § 503.16(b)(4); and (2) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 10 D.C. Code § 503.16(b)(7). *See id.*

On February 25, 2020, Shroyer entered into a Community Service Deferred Prosecution Agreement ("DPA") with the government. *See* Dkts. 1, 8-3. As part of the agreement, Shroyer agreed not to violate any laws and to perform 32 hours of verified community service. *See* 8-3 at 2. Due to the nature of the offense, Shroyer also agreed to follow certain special conditions listed in an Addendum to the DPA:

1.  The defendant agrees not to utter loud, threatening, or abusive language, or to engage in any disorderly or disruptive conduct, at any place upon the United States Capitol Grounds or within any of the Capitol Buildings with intent to impede, disrupt, or disturb the orderly conduct of any session of the Congress or either House thereof, or the orderly conduct within any such building of any hearing before, or any deliberations of, any committee or subcommittee of the Congress or either House thereof.

2.  The defendant agrees not to parade, demonstrate, or picket within any of the Capitol Buildings.

3.  The term "Capitol Buildings" means the United States Capitol, the Senate and House Office Buildings and garages, the Capitol Power Plant, all subways and enclosed passages connecting 2 or more such structures, and the real property underlying and enclosed by any such structure.

4.  The term "United States Capitol Grounds" means the areas delineated in the map below.

*See id.* at 5. As referenced, the DPA included a map that demarcated the "U.S. Capitol and Grounds," using the following boundaries:

> U.S. Capitol Building and Grounds to include all Congressional Buildings and the areas bound by 3rd Street NW / Constitution Avenue NW / Louisiana Avenue NW / 1st Street NW / C Street NW / Louisiana Avenue NW / New Jersey Avenue NW / D Street NW / Louisiana Avenue NW / North Capitol Street NW / Massachusetts Avenue NE / Columbus Circle NE / F Street NE / 2nd Street NE to SE / C Street SE / 1st Street SE / D Street SE / South Capitol Street SW / Washington Avenue SW / Independence Avenue SW / 3rd Street SW, Washington, D.C.

*See id.* at 6. The map also provided a visual representation of these boundaries, as seen below:



4

*See id*. Shroyer and his attorney signed the DPA on February 25, 2020. *See id*. at 4.

While the DPA was for a 4-month term, the COVID pandemic emergency tolled this time period for Shroyer to complete his hours. *See* Dkt. 1 (citing D.C. Superior Court Case Num. 2020 CMD 000820). As of January 5 and 6, 2021, Shroyer had not completed any hours of community service, and the DPA—and Shroyer's stay away order from the U.S. Capitol—was still active. *See id*.

*Shroyer's Rhetoric in Advance of January 6*

In the weeks before January 6th, Shroyer stoked the flames of a potential disruption of the certification vote by streaming disinformation about alleged voter fraud and a stolen election to thousands, perhaps millions, of viewers of his program on InfoWars,[2] and meeting disappointed Trump voters across the country on InfoWars' Stop the Steal caravan. *See* Exhibit 1, November 13, 2020, News2Share Million Maga Eve. On November 13, 2020, Shroyer bragged to a crowd in Washington, D.C. that InfoWars' Stop the Steal movement was able to get 40,000 followers on Parler in five days, and millions of streaming views, proving that "we are still in control of this country." Exhibit 2, November 13, 2020, Shroyer Social Media Views. The following day, on November 14, 2020, Shroyer spoke to another D.C. crowd through a bullhorn, stating that if the mainstream media did not want to "broadcast the American Revolution 2.0, then fine, InfoWars will take the exclusives," to raucous cheers from the crowd gathered around him. Exhibit 3, November 14, News2Share.

---

[2] According to SimilarWeb, a web traffic analysis site, InfoWars.com receives 6 million visits per month. *See* www.similarweb.com/website/infowars.com/#overview. Banned.Video, where the videos from InfoWars are streamed, receives 3.8 million visits per month. *See* www.similarweb.com/website/banned.video/#overview

On the November 18, 2020 broadcast of InfoWars, when talking about the Democrats who have "stolen your country," Shroyer stated that "maybe you deserve what's coming." *See* Exhibit 4, November 18, 2020 InfoWars broadcast, at 01:30 minutes. He added, "But let me tell you: if you steal this election from us and you put in a U.N. communist corrupt criminal Joe Biden in the White House, it's not going to be a million peaceful marchers in D.C. No, no, no. No, it's not. No, it's not." *See* Exhibit 4, November 18, 2020 InfoWars broadcast, at 3:03 minutes.

By December 31, 2020, InfoWars had turned its sights specifically to January 6th, airing a poster with Shroyer depicted with other members of the InfoWars broadcasting team directly in front of an image of the U.S. Capitol, urging people to "Be A Part of History! Fight for Trump" in Washington, D.C., January 6, 2021. *See* Exhibit 5, December 31, 2020, InfoWars Broadcast.



*Stillshot from Exhibit 5, at 00:01 minutes*

*January 5th Address to Crowds Gathered in D.C.*

On January 5, 2021, Shroyer returned to Washington, D.C., where he broadcast from Freedom Plaza, stating "Americans are ready to fight! We aren't exactly sure what that's going to look like, in a couple of weeks, if we cannot stop the certification of this fraudulent election of Joe

Biden." Exhibit 6, January 5, 2021 InfoWars. Shroyer continued "we are letting the crooks in Congress know, that we know Donald J. Trump won this election…and so the crooks in Congress had better know that we the people are here, and we're loud, and we are going to be here all week." Exhibit 6, January 5, 2021 InfoWars, at 00:19 minutes. "We are the new revolution!" Shroyer yelled. "We are going to restore and we are going to save the Republic, and all these great Americans are going to be the ones to do it," while gesturing to the crowd around him. Exhibit 6, January 5, 2021 InfoWars, at 1:08 minutes.

That day, Shroyer also called into another live broadcast on the InfoWars program, stating "What I'm afraid of is if we do not get this false certification of Biden stopped this week, I'm afraid of what this means for the rest of the month, I'm afraid of what this is gonna mean to these Trump supporters, and I'm afraid about what this is going to mean about January 21st … Everybody knows this election was stolen … Are we just going to sit here and become activists for four years or are we going to actually do something about this, whatever that cause or course of cause may be?" Exhibit 7, InfoWars Call In, 11:50 minutes.

In the evening January 5, 2021, Shroyer addressed a crowd at Freedom Plaza in Washington, D.C., on stage in front of a Stop the Steal flag: "For too long now, the people have feared the government. Well, in January 2021, that changes." Exhibit 8, January 5 Speech Freedom Plaza, at 00:10 minutes. He added, "And I can tell you, that the crooked politicians who occupy our Capitol, are in fear right now." Exhibit 8, January 5 Speech Freedom Plaza, at 00:23 minutes. "So, despite all the things that they've done to try to destroy our morale, despite all the things they've done to gaslight us, confuse us, and try to keep us locked inside, we're here more powerful, more loud, and we're fightin' mad." Exhibit 8, January 5 Speech Freedom Plaza, at 1:28 minutes.

*Defendant Shroyer's Role in the January 6, 2021 Attack on the Capitol*

On January 6, 2021, Shroyer attended former President Donald Trump's speech at the Ellipse in downtown Washington, D.C. Early that afternoon, crowds of people began to gather and head toward the Capitol perimeter. Shroyer took to a megaphone in front of one of those crowds on Pennsylvania Avenue: "In 1776, the American patriots sent a loud message to the entire world: Tyranny will not exist in the West. And so now the Democrats are posing as communists, but we know what they really are: they're just tyrants, they're tyrants. And so today, on January 6, we declare death to tyranny! Death to tyrants! Death to tyrants! Death to tyrants!" Exhibit 9, Banned.Video January 6 Pennsylvania Ave Video, at 9:16 minutes.

Shroyer made it clear why he was headed to the Capitol: "Today we march for the Capitol because on this historic January 6, 2021, we have to let our Congressmen and women know, and have to let Mike Pence know, they stole the election, we know they stole it, and we aren't going to accept it." Exhibit 9, Banned.Video January 6 Pennsylvania Ave Video, at 4:19 minutes.

After hearing that people may have breached the Capitol, Shroyer, Person One,[3] and others began leading this large crowd down Pennsylvania Avenue toward the Capitol Building. Shroyer is encircled in red below with a megaphone, at the front of the crowd.

---

[3] Person One is another person who actively participated in events on January 6 and addressed the crowd with a bullhorn, but has not been criminally charged.



*Stillshot from Exhibit 9, at 15:12 minutes*

En route, Shroyer continued shouting to the crowd walking behind and around him through his megaphone: "The traitors and communists that have betrayed us know we're coming. We're coming for all you commie traitors and communists that have stabbed us in the back. You've stabbed us in the back one too many times!" Exhibit 9, Banned.Video January 6 Pennsylvania Ave Video, at 14:30 minutes. He continued, "We will not accept the fake election of that child-molesting Joe Biden, that Chinese Communist agent Joe Biden, we know where he belongs and it's not the White House!" Exhibit 9, Banned.Video January 6 Pennsylvania Ave Video, at 15:30 minutes. Throughout this time, Shroyer led chants of "Stop the steal!" and "Trump won!" Exhibit 9, Banned.Video January 6 Pennsylvania Ave Video, at 17:19.

*Shroyer breaches the perimeter and enters the West Side of the Capitol Grounds*

Just before the Joint Session got underway at 1:00 p.m., Shroyer entered the Capitol Grounds. He first positioned himself with others on the west side of the Capitol Building, within both the restricted area on January 6 and the broader Capitol Grounds boundaries on Shroyer's DPA map seen above. There, he stood on stacks of chairs and other equipment with Person One

and led a crowd of hundreds of individuals on the Capitol grounds in chants of "USA! USA! USA!"[4] Exhibit 10, Parler Video West Front, at 00:22 minutes.



*Stillshot from Exhibit 10, at 00:23 minutes*

*Shroyer Addresses the Crowd on the East Side of the Capitol*

Eventually, Shroyer and others walked east along the Capitol lawn and around the north side of the Capitol Building. A purported security guard for Person One, wearing a body-worn camera, announced to Shroyer and others, "Let's take a break right here. Let me talk to this cop and see if I can get [Person One] up there and deescalate the situation." Exhibit 11, Body Guard Body Cam, at 8:36 minutes. This body-camera individual then walked up to a uniformed police officer guarding the perimeter of the Capitol Building and engaged in conversations while tens of

---

[4] *See* Dkt. 1 at 4 n.6 (citing https://banned.video/watch?id=5ff9df636756f238a5bf9124 (last accessed on November 12, 2021)).

others surrounded the pair, including Shroyer. The police officer tried to get them to go back out through the area where other rioters had breached; the group did not do so. Exhibit 11, Body Guard Body Cam, at 9:20 minutes.

Subsequently, Shroyer, Person One, the body-camera individual, and others walked away from the officer, continuing east around the Capitol Building. As Shroyer and his group curved around the Capitol Building, the body-camera individual stated, "Here's an opening right here." Exhibit 11, Body Guard Body Cam, at 9:42 minutes. Shroyer and his group then walked toward where the body-camera individual pointed, passing downed and moved temporary barricades and stepping over at least one fallen sign that appeared to read "Area Closed," as seen below circled in red. Exhibit 11, Body Guard Body Cam, at 10:01 minutes.



*Stillshot from Exhibit 11, at 10:01 minutes*

Soon after stepping over that sign, the body-camera individual turned around and showed Shroyer, among others, walking with him on the Capitol Grounds in the restricted area. Exhibit 11, Body Guard Body Cam, at 11:08 minutes.



***Stillshot from Exhibit 11, at 11:08 minutes***

Once on the east side of the Capitol building, the body-camera individual again attempted to speak to police officers guarding the perimeter of the Capitol Building to get Person One on the Capitol Building steps. After several attempts, and no positive responses from police to this request, the group decided to "just get him up there, just do it, but we know we might catch a bang or two." Exhibit 11, Body Guard Body Cam, at 17:50 minutes.

Shroyer, Person One, the body-camera individual, and others then approached and entered the Capitol Building's east steps with their hands on each other's backs and shoulders in a "stack," snaking through hundreds of other rioters and deeper into the restricted area. Exhibit 12, East Side Capitol Video, at 30:31 minutes. Once Shroyer and others nearly reached the top, he began to use his megaphone to lead the large crowd in various chants, including "USA!" and "1776!"—an apparent reference to the "first" American Revolution and a renewed need to overthrow the government.[5] Exhibit 12, East Side Capitol Video, at 33:41 and 34:35 minutes. Shroyer is seen below on the right standing near the top of the Capitol Building's east steps with his megaphone while leading one of the chants:

---

[5] *See* Dkt. 1 at 4 n.6 (citing https://banned.video/watch?id=5ff9df636756f238a5bf9124 (last accessed on November 12, 2021)).



*Stillshots from Exhibit 12, at 33:38 and 33:41 minutes*

*Shroyer's Statements on InfoWars on January 6th*

Soon after, on January 6, Shroyer broadcast on InfoWars and explained in an interview what his and others' actions were about, while rioters can be seen continuing to breach the Capitol Building behind him:

> We're here fighting for President Trump, we're here fighting for our elections, we're here fighting for the Republic. We want to use this day as we're seeing all the traitors in the Republican party and Congress, everywhere, stab us in the back … Trump is now a man on a mountain by himself, and he has we the people fighting for him … We want freedom, we want liberty, and when the government fears the people, we have that … We the people are not going to stand for their treason, and we the people are not going stand for rigged elections … We just want a send a peaceful message to … Mike Pence and the congressmembers, 'hey, we voted for Donald Trump, he won the election, you know it, you better do the right thing and not certify the fake vote for Biden.' [6]

*See* Exhibit 13, January 6 Broadcast, at 04:05 minutes.

*Spreading January 6th Misinformation Following January 6th*

In the weeks and months that followed, Shroyer continued to peddle January 6th conspiracy theories on his Internet streaming show. On January 8, 2021, Shroyer had as guests on his show

---

[6] *See* Dkt. 1 at 4 n.5 (citing https://banned.video/watch?id=5ff634c2f23a18318ceb19f1 (last accessed on November 12, 2021)).

January 6th rioters Edward Badalian and Gina Bisignano.[7] Exhibit 14, January 8 InfoWars broadcast. While showing footage of Badalian on the Lower West Terrace of the Capitol, Shroyer shifted the blame for the destruction of property at the Capitol to Antifa, cheering Badalian (who was on using the code name Turbo) for valiantly stopping "Antifa," and stating that he deserved an award. Exhibit 14, January 8 InfoWars broadcast. Badalian has since been convicted at trial for Conspiracy, Obstruction of an Official Proceeding, and Entering and Remaining in a Restricted Building or Grounds, for entering the U.S. Capitol building through that exact window depicted on Shroyer's program. *See*, *United States v. Edward Badalian*, 21-cr-246-2.

On May 17, 2021, on his InfoWars broadcast, Shroyer stated that he "realized something about January 6th." Exhibit 15, May 17 InfoWars broadcast. While downplaying that "yeah, January 6 got a little out of control, yeah, there was some violence against the police,  there was a little bit of violence to the building too, property damage," Shroyer stated that January 6 was "like a mouse that roared" compared to when Democrats riot. Exhibit 15, May 17 InfoWars broadcast, at 00:21 minutes. He went on to say "we should have rejected their narrative of January 6 and frankly, at a certain level, we should have been proud of it. We should have been proud of what happened on January 6. But they stole that from us." Exhibit 15, May 17 InfoWars broadcast, at 00:56 minutes.

On August 20, 2021, the day that Shroyer learned there was a warrant for his arrest based on his actions at the U.S. Capitol grounds on January 6, 2021, he broadcast on InfoWars about a

[7] *See United States v. Edward Badalian,* 21-cr-246-2 (ABJ) and *United States v. Gina Bisignano*, 21-cr-036 (CJN). Badalian has been convicted at trial of three counts, to include Conspiracy, in violation of 18 U.S.C. 371, and Obstruction of an Official Proceeding, in violation of 18 U.S.C. 1512(c)(2). Bisignano plead guilty to 6 counts, including Obstruction of an Official Proceeding and Civil Disorder. She has since withdrawn her guilty plea to the count alleging violation of 18 U.S.C. 1512(c)(2), and is set for trial in April 2024.

"big story" on January 6th. *See* Exhibit 16, August 20 InfoWars broadcast. Shroyer stated that the FBI should be investigated for their role on January 6 and that "Democrats stood down security intentionally." *See* Exhibit 16, August 20 InfoWars broadcast, at 1:50 and 2:18 minutes. Shroyer implied that the government's investigations into the January 6th riots followed the policy attributed to Lavrentiy Beria, Stalin's secret police chief, "Show me the man, and I'll [show you the] crime." *See* Exhibit 16, August 20 InfoWars broadcast, at 3:18 minutes.

After his arrest, Shroyer raised almost $250,000 in an online campaign styled as "Emergency Owen Shroyer Legal Defense Fund" *See* Exhibit 17, Give Send Go Page.[8] The website included the photograph (below) of Shroyer holding a sign that stated, "Tech Companies Banned Me From Social Media. Democrats Are Trying To Ban Me From The Capital [sic]." Exhibit 17, Give Send Go Page.



*Exhibit 17*

---

[8] *See* www.givesendgo.com/campaign/grabwidget?urllink=G27P2 (last accessed August 9, 2023). The government will not be seeking a fine in this case, as this website purports to help pay Shroyer's legal bills. But, the government believes this is relevant information for the Court to consider.

*The Charges and Plea Agreement*

On August 25, 2021, the United States charged Shroyer by a four-count Information with violating 18 U.S.C. 1752(a)(1), 18 U.S.C. 1752(a)(2), 40 U.S.C. 5104(e)(2)(D), and 40 U.S.C. 5104(e)(2)(E). On June 23, 2023, pursuant to a plea agreement, Shroyer pleaded guilty to Count One of the Information, charging him with a violation of 18 U.S.C. 1752(a)(1). By plea agreement, Shroyer agreed to pay $500 in restitution to the Architect of the Capitol.

### III.    Statutory Penalties

Shroyer now faces a sentencing on a single count of violating 18 U.S.C. 1752(a)(1). As noted by the plea agreement and the U.S. Probation Office, Shroyer faces up to one year of imprisonment and a fine of up to $100,000. Shroyer must also pay restitution under the terms of his plea agreement. *See* 18 U.S.C. § 3663(a)(3); *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

### IV.    The Sentencing Guidelines and Guidelines Analysis

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark" for determining a defendant's sentence. *Id.* at 49. The United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and are the "starting point and the initial benchmark" for sentencing. *Id.* at 49.

The government agrees with the Sentencing Guidelines calculation set forth in the PSR. According to the PSR, the U.S. Probation Office calculated Shroyer's adjusted offense level under the Sentencing Guidelines as follows:

| | |
|---|---|
| Base Offense Level (U.S.S.G. §2B2.3(a)) | +4 |
| Specific Offense Characteristics (U.S.S.G. §2B2.3(b)(1)(A)) | +2 |
| Acceptance of Responsibility (USSG §3E1.1(a)) | - 2 |
| **Total Adjusted Offense Level** | **4** |

*See* PSR at ¶¶ 33 to 42.

The U.S. Probation Office calculated Shroyer's criminal history as a level II. PSR at ¶ 46. Accordingly, the U.S. Probation Office calculated Shroyer's corresponding Guidelines imprisonment range at 0 to 6 months. PSR at ¶¶ 81. Shroyer's plea agreement contains an agreed-upon Guidelines' calculation that mirrors the U.S. Probation Office's calculation.

Here, while the Court must consider the § 3553 factors to fashion a just and appropriate sentence, the Guidelines unquestionably provide the most helpful benchmark. As this Court knows, the government has charged a considerable number of persons with crimes based on the January 6 riot. This includes hundreds of felonies and misdemeanors that will be subjected to Guidelines analysis. In order to reflect Congress's will—the same Congress that served as a backdrop to this criminal incursion—the Guidelines are a powerful driver of consistency and fairness.

## V.     Sentencing Factors Under 18 U.S.C. § 3553(a)

In this misdemeanor case, sentencing is guided by 18 U.S.C. § 3553(a), which identifies the factors a court must consider in formulating the sentence. The Section 3553(a) factors weigh in favor of 120 days' incarceration.

## A.  The Nature and Circumstances of the Offense

The attack on the U.S. Capitol on January 6 posed "a grave danger to our democracy." *United States v. Munchel*, 991 F.3d 1273, 1284 (D.C. Cir. 2021). The attack "endangered hundreds of federal officials in the Capitol complex," including lawmakers who "cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters." *United States v. Judd*, 21-cr-40, 2021 WL 6134590, at *5 (D.D.C. Dec. 28, 2021). While assessing Shroyer's participation in that attack to fashion a just sentence, this Court should consider various aggravating and mitigating factors. Notably, for a misdemeanor defendant like Shroyer, the absence of violent or destructive acts is not a mitigating factor. Had Shroyer engaged in such conduct, he would have faced additional criminal charges.

One of the most important factors in Shroyer's case is his access to and use of the platform that is his Internet streaming program, both before, during, and after January 6th. The events of January 6th did not happen in a bubble; individuals like Shroyer stoked the fires of discontent with the outcome of the 2020 Presidential election online, driving a mob of individuals to descend on Washington, D.C. on January 6th. Shroyer cannot light a fire near a can of gasoline, and then express concern or disbelief when it explodes.

And the First Amendment is no bar to the Court's consideration of Shroyer's words and actions at sentencing. "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661. The Supreme Court has likewise "long recognized that sentencing judges 'exercise a wide discretion' in the types of evidence they may consider when imposing sentence and that '[h]ighly relevant—if not essential—to [the] selection of an appropriate sentence is the possession of the

fullest information possible concerning the defendant's life and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 480 (2011) (citation omitted). "[T]he sentencing authority has always been free to consider a wide range of relevant material." *Payne v. Tennessee*, 501 U.S. 808, 820–821 (1991).

Consistent with this principle, the Supreme Court has held that "the Constitution does not erect a *per se* barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment." *Dawson v. Delaware*, 503 U.S. 159, 165 (1992). Indeed, a court may impose a sentence "based on" a defendant's protected beliefs as long as those beliefs are "relevant to the issues involved," *id.* at 164, just as a court may permit "the evidentiary use of speech to establish the elements of a crime or to prove motive or intent." *Wisconsin v. Mitchell*, 508 U.S. 476, 485 (1993); *see also United States v. Alvarez-Nunez*, 828 F.3d 52, 55-56 (1st Cir. 2016) (conduct that otherwise may be "protected by the First Amendment may be considered in imposing sentence" if it is "relevant to the issues in a sentencing proceeding" including "the degree of the defendant's remorse, . . . the likelihood of reoffending, . . . or the extent of punishment needed for deterrence"). As the Second Circuit has recognized, the Court is "*required* to sentence a convicted defendant based in part on his or her 'history and personal characteristics,'" and "a person's history and personal characteristics can often be assessed by a sentencing court only or principally through analysis of what that person has said –in public, in private, or before the court." *United States v. Stewart*, 686 F.3d 156, 166 (2d Cir. 2012); *see also United States v. Schmidt*, 930 F.3d 858, 865 (7th Cir. 2019) (recognizing that "courts of appeals also have upheld a sentencing judge's consideration of the defendant's protected associations, beliefs, or statements because that evidence was relevant to the sentencing factors set forth in 18 U.S.C. § 3553(a)"); *United States v. Fell*, 531 F.3d 197, 228 (2d

Cir. 2008); *Kapadia v. Tally*, 229 F.3d 641, 648 (7th Cir. 2000) ("Nothing in the Constitution prevents the sentencing court from factoring a defendant's statements into sentencing when those statements are relevant to the crime or to legitimate sentencing considerations."); *United States v. DeChristopher*, 695 F.3d 1082, 1099 (10th Cir. 2012) ("[F]ar from punishing [the defendant] for the content of his . . . statements," the district court "simply relied on those statements to determine the sentence necessary to deter [the defendant] from future violations and to promote respect for the law.")..

Shroyer's words and criminal actions surrounding January 6 are inextricably intertwined. Imposing a sentence of incarceration would not punish Shroyer for his beliefs or for any associations—it would punish him based on appropriate § 3553(a) factors. His statements and actions leading up to and on January 6, for example, evince the depth of his intent to stop the transfer of presidential power through sheer volume. The Court must consider that evidence to determine how best to enforce respect for the law and to deter Shroyer, specifically.

The fact that Shroyer was on release in a pending case for nearly *the same conduct* highlights how important his words and actions are in considering how best to specifically deter him moving forward. Shroyer had an active order to stay away from the U.S. Capitol and grounds because of his pending criminal matter in D.C. Superior Court. Unlike almost every other January 6th defendant, Shroyer had a map with clear delineations of not only what constituted the restricted grounds, but an admonition not to trespass there. His decision to do so anyway on January 6th shows both his contempt for the law and the depth of his motivation to join the mob overwhelming Capitol Police and stopping the Congressional activities of the day.

Finally, his statements and actions *after* January 6 illustrate his complete lack of remorse. To date, despite a number of opportunities he has taken to speak about the election and January 6,

he has yet to sincerely demonstrate genuine remorse for his conduct. As recently as August 28, 2023, Shroyer continued to spread the conspiracy theories surround the 2020 Presidential election on his Internet streaming program for anyone with a computer to watch: that Donald Trump won the 2020 Presidential election, and he will win in 2024 unless there is fraud like there was previously.

In sum, the Court can and should consider the defendant's statements and conduct in determining an appropriate sentence, which should include incarceration in light of the nature and the circumstances of his offense.

## B.  The History and Characteristics

Shroyer's criminal history contains three prior arrests, at least two of which resulted in a conviction. PSR ¶ 44-48. While none of these arrests or convictions involve serious violent felonies, they do belie a lack of respect for law enforcement and a reckless disregard for the well-being of others.

## C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

The attack on the U.S. Capitol building and grounds was an attack on the rule of law. As with the nature and circumstances of the offense, this factor supports a sentence of incarceration, as it will in most cases, including misdemeanor cases, arising out of the January 6 riot. *See United States v. Joshua Bustle and Jessica Bustle*, 21-cr-238-TFH, Tr. 08/24/21 at 3 ("As to probation, I don't think anyone should start off in these cases with any presumption of probation. I think the presumption should be that these offenses were an attack on our democracy and that jail time is usually – should be expected") (statement of Judge Hogan).

**D.  The Need for the Sentence to Afford Adequate Deterrence**

Deterrence encompasses two goals: general deterrence, or the need to deter crime generally, and specific deterrence, or the need to protect the public from further crimes by this defendant. 18 U.S.C. § 3553(a)(2)(B-C), *United States v. Russell*, 600 F.3d 631, 637 (D.C. Cir. 2010).

*General Deterrence*

The need for general deterrence weighs heavily in favor of incarceration in nearly every case arising out of the violent riot at the Capitol. Indeed, general deterrence may be the most compelling reason to impose a sentence of incarceration. "Future would-be rioters must be deterred." (statement of Judge Nichols at sentencing, *United States v. Thomas Gallagher*, 1:21-CR-00041 Tr. 10/13/2021 at 37).

General deterrence is an important consideration because many of the rioters intended that their attack on the Capitol would disrupt, if not prevent, one of the most important democratic processes we have: the peaceful transfer of power to a newly elected President.

The gravity of these offenses demands deterrence. *See United States v. Mariposa Castro*, 1:21-cr-00299 (RBW), Tr. 2/23/2022 at 41-42 ("But the concern I have is what message did you send to others? Because unfortunately there are a lot of people out here who have the same mindset that existed on January 6th that caused those events to occur. And if people start to get the impression that you can do what happened on January 6th, you can associate yourself with that behavior and that there's no real consequence, then people will say why not do it again."). This was not a protest. *See United States v. Paul Hodgkins*, 21-cr-188-RDM, Tr. at 46 ("I don't think that any plausible argument can be made defending what happened in the Capitol on January 6th as the exercise of First Amendment rights.") (statement of Judge Moss). And it is important to

convey to future potential rioters—especially those who intend to improperly influence the democratic process—that their actions will have consequences. There is possibly no greater factor that this Court must consider.

*Specific Deterrence*

Specific deterrence for this defendant drives much of the government's recommendation in this matter. First, a pending criminal case for strikingly similar conduct—disorderly conduct on the grounds of the U.S. Capitol with the intent to disrupt proceedings there in—with an active stay away order was not enough to deter Shroyer from the conduct to which he has pled guilty here. Criminal convictions in the District of Columbia are not trophies, and this defendant needs to be deterred from returning to commit specifically this type of conduct ever again.

Second, Shroyer's use of his extensive platform on Infowars drastically amplified his thinly veiled calls to violence on January 6th. As noted above, since January 6th, Shroyer has downplayed, has obfuscated, and has told his viewers that "we should be proud of January 6." Exhibit 15, May 17 InfoWars Broadcast. In the 31 months since the January 6th attack on the Capitol, approximately 372 defendants have been charged with assaulting, resisting, or impeding officers or employees, including approximately 112 individuals who have been charged with using a deadly or dangerous weapon or causing serious bodily injury to an officer. *See*, https://www.justice.gov/usao-dc/31-months-jan-6-attack-capitol#:~:text=Approximately%2011%20individuals%20have%20been,restricted%20federal%20building%20or%20grounds. Approximately 140 police officers were assaulted on January 6th at the Capitol. *Id.* Approximately 64 defendants have been charged with destruction of government property, and approximately 51 defendants have been charged with theft of government property. *Id.* More than 310 defendants have been charged with corruptly obstructing, influencing, or impeding an official proceeding, or attempting to do so. *Id.* This is

what Shroyer said to his audience of thousands is "a little out of control." This is the "narrative" he is encouraging his followers to reject. This is what he wants his viewers to take pride in.

As the Hon. Judge Lamberth noted in a recent memorandum opinion in *United States v. Jacob Chansley,* 21-cr-003, Dkt. 127, it is problematic when those who broadcast their message to large audiences repeat information "replete with misstatements and misrepresentations regarding the events of January 6, 2021 too numerous to count" and "explicitly question[] the integrity of this Court—not to mention the legitimacy of the entire U.S. criminal justice system." Dkt. 127, at 33. Citing George Orwell, Judge Lamberth expressed concern for calling on followers to "'reject the evidence of [their] eyes and ears,' language resembling the destructive, misguided rhetoric that fueled the events of January 6 in the first place." *Id.* This Court, however, need not reject the evidence before it.

### E.  The Need to Avoid Unwarranted Sentencing Disparities

As the Court is aware, the government has charged hundreds of individuals for their roles in this one-of-a-kind assault on the Capitol, ranging from unlawful entry misdemeanors, such as in this case, to assault on police officers, to conspiracy to corruptly interfere with Congress.[9] This Court must sentence Shroyer based on his own conduct and relevant characteristics, but should give substantial weight to the context of his unlawful conduct: his participation in the January 6 riot.

Shroyer has pleaded guilty to Count One of the Information, which is a Class A misdemeanor. 18 U.S.C. § 3559. The sentencing factors set forth in 18 U.S.C. § 3553(a), including

---

[9] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

"the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(6), do apply, however.

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct". So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009). *See id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6)."). If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Jennifer "Jenna" Ryan, 21-cr-50, traveled from Texas to the Capitol on January 6th on a private jet with other supporters. Ryan, a self-described "influencer," had broadcasts over various platforms including social media, YouTube, and radio, garnering thousands of followers and millions of views. *See* Government Sentencing Memorandum, Dkt. 48. On January 6th, she live-streamed her activities on Capitol grounds, which included entering the building past overwhelmed Capitol Police officers on the East side of the building. After the riot, she publicly and repeatedly communicated a lack of remorse in multiple television interviews and social media postings. After she pleaded guilty to one count of Parading, Demonstrating or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), Judge Cooper sentenced Ryan to 60 days incarceration.

Boyd Camper, 21-cr-325, entered the Capitol building on January 6th through the Upper West Terrace door, after getting tear gas in his eyes on the way to the door. *See* Government Sentencing Memorandum, Dkt. 30. After exiting the Capitol, Camper participated in a video interview with a CBS News reporter while still on or near Capitol grounds. In the interview, Camper acknowledged that he was inside the Capitol, stating, "I was on the front line." He further stated, "We're going to take this damn place. If you haven't heard it's called the insurrection act and we the people are ready." After Camper pleaded guilty to one count of violating § 5104(e)(2)(G), Judge Kollar-Kotelly sentenced him to 60 days' incarceration.

Frank Scavo, 21-cr-254, unlawfully entered the Capitol through the Rotunda Doors on January 6th while taking video of assaults on police with his cellphone. *See* Government Sentencing Memorandum, Dkt. 37. Scavo's participation in the breach of the Capitol drew attention from news media in his local community, and he gave an interview with a local news station after January 6, in which he described hearing "the first boom," observing "people up along the railing," and "tear gas and another series of flashbangs." *See* Government Sentencing Memorandum, Dkt. 37. Scavo changed his profile picture on Facebook to a political cartoon that was published in a local Scranton newspaper, portraying Scavo driving a bus named the "Sedition Express" to the Capitol on January 6. *Id.* After Scavo pleaded guilty to violating § 5104(e)(2)(G), Judge Lamberth sentenced him to 60 days' incarceration.

Similar to Ryan, Camper, and Scavo, Shroyer had a platform to tout his encouragement of and participation in the attack on the Capitol to thousands of people. Unlike those defendants, Shroyer had additional reason to know he should not be at the Capitol that day—his pending case in D.C. Superior Court with an active order to stay away from the Capitol grounds. That is a significant aggravator, deserving of a significantly higher sentence than those defendants.

The fact that Shroyer did not enter the Capitol should not deter the Court from considering imprisonment as a just and warranted sentence. As an initial matter, he breached the restricted grounds, Capitol steps, and stopped just short of the East Rotunda Doors. His conduct alone, let alone his statements to his followers, played a role in halting the proceedings that day by helping to spread law enforcement officers thin. In any event, his conduct is, in part, accounted for in the charge and related sentencing guidelines he faces. And other courts have previously sentenced defendants who were not even in Washington, D.C. to imprisonment based on the totality of their conduct and surrounding circumstances on January 6. *See, e.g.*, *United States v. Edward Vallejo*, Case No. 22-cr-15-APM (Sentencing court imposed 36 months' imprisonment and 12 months' home confinement for the defendant's conduct in participating in the Oath Keepers "quick reaction force" on January 6 by remaining at the hotel with the firearms). While Vallejo's conduct may be more significant than Shroyer's, it is an example for this Court to consider in determining that a sentence of imprisonment can be, and is, warranted regardless of a defendant's lack of presence in the Capitol building itself.

In any event, the goal of minimizing unwarranted sentencing disparities in § 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The § 3553(a) factors that this Court assesses are "open-ended," with the result that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an

appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095.

## VI.    Restitution

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[10] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Shroyer must pay $500 in restitution, which reflects in part the role Shroyer played in the riot on January 6.[11] Plea Agreement at ¶ XII. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,923,080.05" in

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of July 2023. *Id.*

## VII.    Conclusion

Sentencing requires the Court to carefully balance the § 3553(a) factors, considering the totality of the defendant's conduct and the surrounding circumstances. Balancing these factors, the government recommends that this Court sentence Defendant to 120 days of incarceration, 12 months of supervised release, 60 hours of community service, and $500 in restitution. Such a sentence protects the community, promotes respect for the law, and deters future crime by imposing restrictions on his liberty as a consequence of his behavior, while recognizing his acceptance of responsibility for his crime.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

BY: ___/s/_____
KIMBERLY L. PASCHALL
Assistant United States Attorney
National Security Section
D.C. Bar No. 1015665
601 D Street, N.W.,
Washington, D.C.
Kimberly.Paschall@usdoj.gov
202-252-2650

_____
Troy A. Edwards, Jr.
N.Y Bar No. 5453741
Assistant United States Attorney
601 D St., NW
Washington, D.C. 20001
troy.edwards@usdoj.gov
(202) 252-7081