**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | 1:21-cr-00542-TJK |
| v. | : | |
| | : | |
| JONATHAN OWEN SHROYER. | : | OCTOBER 9, 2023 |

**<u>DEFENDANT'S REPLY TO GOVERNMENT'S OPPOSITION TO MOTION FOR
RELEASE PENDING APPEAL</u>**

On September 19, 2023, the defendant filed a motion for release pending appeal pursuant to 18 U.S.C Section 1343(b). The Government was directed to file a response on or before September 27, 2023, and has done so. Mr. Shroyer had hoped to file his merits brief in the Court of Appeals by this date, but is unable to designate the contents of the Appendix as Government counsel has yet to appear on the appeal and is therefore unable to file his brief. He offers a portion of his draft appellate brief here as a show of confidence in the merits of the appeal. He contends that the appeal raises a "substantial question of law" likely to result in an outcome less onerous than that imposed at sentencing.

Mr. Shroyer was sentenced on September 12, 2023, and released pending designation by the Bureau of Prisons. He is currently scheduled to turn himself in on October 24, 2023.

I. **The Court's Reliance on Protected Speech in the Context of Sentencing a Defendant After a Guilty Plea is the Sort of Structural Error that Permits an Appeal Even Though the Sentence Imposed is Less Than the Maximum Contemplated by an Appellate Waiver**

A. **Standard of Review**

The appellant does not raise "significant procedural error" on appeal. He focuses, instead, on substantively unreasonableness. *United States v. Lawrence,* 662 F.3d 551, 556 (D.C.Cir. 2011). He does so recognizing the difficulties of such a challenge, especially in a case where the sentence imposed falls within the guidelines range. *Gall V. United States*, 552 U.S. 38, 51 (2007). Appellate review of such a challenge is normally under an abuse of discretion standard: "In considering a defendant's challenge to the substantive reasonableness of a sentence, we ask the following question: 'In light of the facts and circumstances of the offense and offender, is the sentence so unreasonably high or unreasonably low as to constitute an abuse of discretion by the district court?' *United States v. Gardellini*, 545 F.3d 1089, 1093, 383 U.S. App. D.C. 278 (D.C. Cir. 2008). 'It will be the unusual case when an appeals court can plausibly say that a sentence" is substantively unreasonable in light of all the circumstances. *In re Sealed Case*, 809 F.3d 672, 676, 420 U.S. App. D.C. 426 (D.C. Cir. 2016) (citation omitted).'" *United States v. Williamson*, 903 F.3d 124, 136, (U.S. App. D.C. 2018) .

The defendant contends that a case challenging the use of protected speech as relevant offense conduct is reviewable notwithstanding an appellate waiver. It is never permissible to burden or chill protected speech in the context of a criminal sentencing.

B. **Substantive Unreasonableness and the First Amendment**

A defendant can challenge a sentence imposed on grounds that the sentence violates the First Amendment. *Dawson v. Delaware*, 503 U.S. 159, 163 (1992). "[T]he Constitution does not prevent a sentencing court from considering an individual's First Amendment-protected 'beliefs and associations' in fixing a sentence, when those beliefs and associations are relevant to determining an appropriate sentence. *Dawson,* 503 U.S. at 165,…"(parallel citations omitted) *Williamson*, 903 F.3d 136.

Sentencing courts have broad discretion to consider relevant conduct and beliefs in crafting an appropriate sentence, *Payne v. Tennessee*, 501 U.S. 808, 820-821 (1991). "[A] judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come," *United States v. Tucker*, 404 U.S. 443, 446 (1972). But courts are not free to consider mere "abstract beliefs…. The government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989)"; *Dawson* at 167-168.  For otherwise protected speech to be relevant and material at sentencing some nexus to the crime must be shown, otherwise the evidence is mere propensity evidence. Protected speech and activity must bear some relationship to the offense conduct. *Barclay v. Florida*, 463 U.S. 939, 970 (1983)(The defendant's membership in the Black Liberation Army and his desire to start a race war were "related to" the murder of a white hitchhiker.) Id., pp. 942-44.

These sorts of issues typically arise in the sentencing phases of capital proceedings. Mr. Shroyer contends they are equally salient in a Frist Amendment challenge arising from the use of protected political speech in a criminal sentencing.

> As the *Dawson* Court noted, the First Amendment
>
>> prevents the State from criminalizing certain conduct in the first instance. But it goes further than that. It prohibits a State from denying admission to the bar on the grounds of previous membership in the Communist Party, when there is no connection between that membership and the "good moral character" required by the State to practice law. *Schware* v. *Board of Bar Examiners of N. M.*, 353 U.S. 232, 1 L. Ed. 2d 796, 77 S. Ct. 752 (1957). It prohibits the State from requiring information from an organization that would impinge on First Amendment associational rights if there is no connection between the information sought and the State's interest. *Bates* v. *Little Rock*, 361 U.S. 516, 4 L. Ed. 2d 480, 80 S. Ct. 412 (1960); *NAACP* v. *Alabama ex rel. Patterson*, 357 U.S. 449, 2 L. Ed. 2d 1488, 78 S. Ct. 1163 (1958). We think that it similarly prevents Delaware here from employing evidence of a defendant's abstract beliefs at a sentencing hearing when those beliefs have no bearing on the issue being tried.

*Dawson v. Delaware*, 503 U.S. 159, 168 (1992).

The life and death stakes in a capital case may seem worlds removed from the consequences attending sentencing for misdemeanor trespassing, but the Constitutional principles in a case involving protected speech are vital and fundamental. On January 6, 2021, Mr. Shroyer was engaging in the quintessential First Amendment activities of peaceful assembly, petitioning for redress of grievances and freedom of speech. "Congress shall make no law … abridging the freedom of speech, …; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Cons., Am I. At some point in the course of the day, the protest turned into a riot, and Mr. Shroyer trespassed, entering into, and remaining on, Capitol grounds when he did not have permission to do so. He pleaded guilty to that. But his political ideas,

his right peacefully to assemble, his right to petition for redress of grievances, retained their full force and vigor throughout the day, and in the days preceding and following the riot.

Hyperbolic speech, mere abstract calls for violence at some future date, advancing a claim about the moral propriety of violence, are all forms of protected speech with a long pedigree. As *Brandenburg v. Ohio*, 395 U.S. 444 (1969) makes clear, mere abstract advocacy of lawlessness is protected speech: "[T]he constitutional guarantees of free press and free speech do not permit a state to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action." *Brandenburg,* 395 U.S. at 447. In subsequent cases, the courts have shed additional light on the "imminence" and "likely to incite" requirements.

> In the seminal case of *Brandenburg*…the Supreme Court held that abstract advocacy of lawlessness is protected speech under the First Amendment. Although the Court provided little explanation for this holding in its brief *per curiam* opinion, it is evident that Court recognized from our own history that such a right to advocate lawlessness is, almost paradoxically, one of the ultimate safeguards of liberty. Even in a society of laws, one of the most indispensable freedoms is that to express in the most impassioned terms the most passionate disagreement with the laws themselves, the institutions of, and created by, law, and the individual officials with whom the laws and institutions are entrusted. Without the freedom to criticize that which constrains, there is no freedom at all.

*Rice v. Paladin Enter.*, 128 F.3d 233, 243 (4th Cir., 1997). Accordingly, the *Brandenburg* court held that speech that "'advocates [a] law violation [is protected by the First Amendment] except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action.'" *State v. Ryan*, 48 Conn.App. 148, 159 (1998) citing *Brandenburg*, supra, 395 U.S. at 447. Put more simply, to lose

First Amendment protection, comments at issue must (1) be directed to inciting or producing imminent lawless action and (2) likely to incite or produce the action advocated.

An expression of a desire to see another person dead, even to wish in some hypothetical future to be the executioner of a foe, is not enough to transform an abstract hope into an imminent threat. "Sometime I will see the time we can stand a person like this S.O.B. against the wall … and shoot him," the defendant said in *Noto v. United States*, 367 U.S. 290, 296 (1961). Id., 296. The Supreme Court was unmoved: "Surely the offhand remarks that certain individuals hostile to the Party would one day be shot cannot demonstrate more than the venomous or spiteful attitude of the Party toward its enemies, and might be expected from the Party if it should ever succeed to power." Id., 298. "It is present advocacy, and not an intent to advocate in the future or a conspiracy to advocate in the future once groundwork has been laid, which is an element of the crime…." Id, 298.

"Political hyperbole" is distinguishable from a true or imminent threat. Thus, a speaker convicted of violating a federal law against threatening to take the life of the president had his conviction vacated when the Supreme Court concluded the following utterance was protected speech when uttered by a draft resister: "If they ever make me carry a rifle the first man I want to get in my sights is L.B.J. They are not going to make me kill my black brothers." *Watts v. United States*, 394 U.S. 705 (1969).

A menacing utterance spoken directly to another person is also protected. The Supreme Court considered both the context in which an utterance was made and the emotionally charged nature of the speech itself in concluding that the following was protected speech: An NAACP organizer told a group of African-Americans attending a

6

rally in support of the boycott of white-owned business: "If we catch any of you going in any of those racist stores, we're gonna break your damn neck." *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 902 (1982). "[M]ere advocacy of the use of force or violence does not remove speech from the protection of the First Amendment." Id. 927.

> In the passionate atmosphere in which the speeches were delivered, they might have been understood as inviting an unlawful form of discipline or, at least, intending to create a fear of violence whether or not improper discipline was specifically intended…. The emotionally charged rhetoric of … [the language] did not transcend the bounds of protected speech…Id., 927-928.

In *Hess v. Indiana*, 414 U.S. 105 (1973) the Court overturned the conviction of a Vietnam antiwar protestor who uttered to a crowd of activists who had just been removed from a public street by local law enforcement agents: "[W]e'll take the fucking street later (or again)." The Court determined this utterance was, "at worst, … nothing more than advocacy of illegal action at some indefinite future time." Id., 108.

In 2023, the Supreme Court established a new standard for distinguishing true threats from protected speech, requiring an objective standard to guard against overbroad use of a criminal statute to chill lawful speech. *Counterman v. Colorado*, 600 U.S. 66 (2023). Obviously, the *Counterman* decision was a "true threats" case and not an incitement case, but the rationale supporting the *Counterman* decision applies even more forcefully in a case involving incitement and political speech. In *Counterman*, the Court concluded that proof of a true threat must involve some subjective understanding on the part of a person uttering the comment that the speech is, in fact, threatening. While rejecting a requirement of a specific intent to threaten, the Court concluded that a subjective awareness of recklessness was required. As the Court noted, "[T]he First

Amendment … still demand[s] a subjective mental-state requirement shielding some true threats from liability. The reasons related to what is often called a chilling effect. Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries." *Counterman*, slip. op., p. 6.  "Like threats, incitement inheres in particular words used in particular contexts: Its harm can arise even when a clueless speaker fails to grasp the expression's nature and consequences. But still, the First Amendment precludes punishment, whether civil or criminal, unless the speakers' words were 'intended' (not just likely) to produce imminent disorder. *Hess v. Indiana*, 414 U.S. 105, 106 (1973)(per curiam); see *Brandenburg*, 395 U.S. at 447; *NAACP v. Clairborne Hardware Co.*, 458 U.S. 886, 927-929 (1982). That rule helps prevent a law from deterring 'mere advocacy' of illegal acts – a kind of speech falling within the First Amendment's core. *Brandenburg*, 395 U.S. at 449." *Counterman*, slip. op., p. 8.

A claim raising a violation of the First Amendment by the sentencing court is reviewable as substantive error.

C. **The Government's Sentencing Argument**

The Government made no secret of the fact that it sought to punish Mr. Shroyer for more than mere trespass. "In the months prior to January 6, Shroyer spread election disinformation paired with violent rhetoric to hundreds of thousands, if not millions, of viewers," its sentencing memorandum began. Government's Sentencing Memorandum, hereinafter "GSM," p.1. He "presciently warned in November" of the potential for violence. The Government devoted three full pages of its sentencing memorandum to Mr. Shroyer's speech prior to January 6. GSM, pp. 5-7., and four pages to his spreading of

"misinformation" following January 6. GSM, pp. 13-16.. On January 6th itself he said, via megaphone, before leading a crowd to the Capitol: "The Democrats are posing as communists, but we know what they really are: they're just tyrants, they're tyrants. And so today, on January 6, we declare death to tyranny. Death to tyrants!"  He chanted "1776!" on the steps of the Capitol, "where rioters would eventually violently breach the Capitol and its police line and halt the peaceful transfer of presidential power." While on the Capitol steps, he stood next to another protestor who was urging the crowd to turn away from the Capitol.[1] GSM, p. 10. In the aftermath of the riot, he told followers: "We should have been proud of what happened." Id. In the Government's view: "Shroyer helped create January 6." Id., p.1.

The Government then shockingly attempted to mislead the Court, contending that Mr. Shroyer had not completed the community service requirement of an earlier Deferred Prosecution Agreement involving his disruption of a House Judiciary Committee meeting in December 2019 involving the impeachment of Donald Trump. GSM, p. 5. The Government abandoned that argument at sentencing after Mr. Shroyer presented evidence to the Court that he had, in fact, completed those hours. The evidence included email correspondence with federal prosecutors. Shroyer Sentencing Memorandum, pp. 6-7.  When the Government refused to dismiss the action under the DPA, notifying Mr. Shroyer that it had opened an investigation against him related to January 6, 2021, Mr.

---

[1] One of Mr. Shroyer's colleagues is heard on a recording saying, as the group approached officers outside the Capitol. "Let's take a break right here. Let me talk to this cop and see if I can get [Person One] up there and deescalate the situation."  GSM, p. 10.  Person one is Alex Jones. Sentencing Transcript, p. 29.

Shroyer filed a motion to dismiss the underlying case. That motion was never adjudicated, and the case was nolle'd after imposition of sentence in the instant case.

The Government explicitly relied on Mr. Shroyer's speech as a factor in urging a sentence of incarceration: "Shroyer's use of his extensive platform on Infowars drastically amplified his thinly veiled calls to violence on January 6th." "On November 13, 2020, Shroyer bragged to a crowd in Washington, D.C. that Infowars' Stop the Steal movement was able to get 40,000 followers on Parler in five days, and millions of streaming views, proving that 'we are still in control of this country.'"  GSM, p. 5. He "stoked the fire of hundreds of thousands of his followers with violent rhetoric and disinformation about the lection leading up to January 6 and during the march he helped lead to the restricted grounds,…" GSM, p. 2.

Each and every one of these utterances was protected speech, and the Government's effort to criminalize them undermines core First Amendment values. The Government never charged Mr. Shroyer with a crime pertaining to his speech, neither incitement nor any direct criminal conduct resulting from his utterances, nor conspiracy, in which otherwise protected speech is presented as circumstantial evidence of an intent to commit a crime, such as seditious conspiracy.

Although the Government tried to walk back its use of Mr. Shroyer's speech as a sentencing factor, "His conduct alone, let alone his statements to his followers, played a role in halting the proceedings that day by helping to spread law enforcement officers thin," GSM p. 28, the Government's position was anchored in disdain for Mr. Shroyer's speech before, during and after the events of January 6.

10

As the Government concluded in its sentencing remarks to the Court: Mr. Shroyer is "a well-known individual particularly among this segment of the population, What he does matters. His words matter…. [H]is ability to garner a following from the crowd is something your Honor should consider when thinking about those words."  ST, pp. 36-37

D. **The Court's Imposition of Sentence**

The Court began its sentencing remarks by noting the need to consider Mr. Shroyer's involvement in "the event," an invent the Court characterized as "threaten[ing] the peaceful transfer of power from one president to another… the nature and circumstances of the offence were quite serious." ST, p. 38.

In imposing sentence, the Court noted that Mr. Shroyer was "not merely a trespasser that day, although that was the nature of what he pled guilty to, but that he did play a role in amping up the crowd on the Capitol Steps by leading chants that day, ,,, [and] on the whole and on the entire record before me, including some the statements the Government has brought to my attention, I'm not sure that he has disavowed in general – what happened on January 6,…" Id. 44. The Court imposed a sentence of 60 days, not the period of probation recommended by the pre-trial services office, Id., and not the 120 days requested by the government.

E. **The Court's Substantively Unreasonable Decision to Punish Protected Speech**

The final sentencing recommendation of the Office of Probation was for a period of probation. The Court thought otherwise, and it did so because it considered Mr. Shroyer's speech as relevant offense conduct.

The Court's reliance on Mr. Shroyer's otherwise protected speech is an abuse of the Court's discretion warranting a remand for resentencing. It is anathema in the United States to permit to Government to rely on protected speech in whole or in part to cause a person harm. *Mt. Healthy City School Board of Education v. Doyle*, 429 U.S. 274 (1977)(holding in the context of public employment that if protected First Amendment conduct was a "substantial factor" supporting adverse employment action an employee's rights were violated). This Circuit has long been familiar with applying a mixed motive analysis in employment contexts.

"The First Amendment prohibits the Government from discriminating, harassing, or retaliating because of political party, association, or speech. *See Rutan v. Repub. Party of Ill.*, 497 U.S. 62, 75, 110 S. Ct. 2729, 111 L. Ed. 2d 52 (1990). To establish a First Amendment claim, Intervenors must allege that (1) they engaged in protected conduct; (2) that the Executive Branch Defendants took some retaliatory action sufficient to deter a person of ordinary firmness in Intervenors' position from speaking again; and (3) that there is a "causal link" between the two. *Scahill v. Dist. of Columbia*, 909 F.3d 1177, 1185, 439 U.S. App. D.C. 69 (D.C. Cir. 2018). To establish that causal link, a plaintiff must allege  that the protected speech was "the but-for cause of the retaliatory action," *id.*, meaning that "the adverse action against the plaintiff would  not have been taken absent" the defendant's "retaliatory motive," *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722, 204 L. Ed. 2d 1 (2019)." *Comm. on Ways & Means v. United States Dep't of the Treasury*, 575 F. Supp. 3d 53, 81-82 (2021).

The appellant contends here that a similar mixed motive analysis should be applied in the context of a claim alleging that otherwise protected speech was used as relevant offense conduct. He contends that such an approach is consistent with the growing reluctance of Courts to view with equanimity the use of "acquitted offense conduct" in the course of sentencing, an issue that lead to the following rebuke from Justice Sotomayor in the Supreme Court's most recently completed term in a written decision denying certiorari to review the practice.  "[A]cquitted-conduct sentencing also raises questions about the public's perception that justice is being done, a concern that is vital to the legitimacy of the criminal justice system." *McClinton v. United States*, 600 U.S. ___ (2023), p. 4 (on denial of a petition for a writ of certiorari). Bedrock First Amendment principles involving freedom of speech, the rights to peacefully assemble and to petition for redress of grievances in the context of a political rally are no less deserving of solicitude. Enhancing a criminal penalty by reference to protected speech represents a fundamental assault on core values going to the legitimacy of the criminal justice system,

Each and every comment Mr. Shroyer made prior to January 6, on January 6 and after January 6 is protected speech. None of the comments were used to show that he possessed a motive to engage in prohibited conduct. The Court used that speech to punish more severely the commission of misdemeanor trespassing as a way of deterring others from engaging in similar conduct at future political rallies. This is a direct assault on protected activity in an area – political speech – that is at the core of any reading of what the First Amendment protects. Gey, Steven, *The Brandenburg Paradigm and Other First Amendments*, 12 U. Pa. J. Const. L. 971(2010)(a general discussion of the

expansion of First Amendment speech beyond its incontrovertible core involving political speech).

The Court did not address such seminal cases as *Chaplinsky v. New Hampshire*, 315 U.S. 568 (1942)(telling a police officer "you are a God damned racketeer" and a "damned fascist" is protected speech); *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1960)("mere abstract teaching of the moral propriety or even necessity for resort to force and violence" protected); *Hess v. Indiana*, 414 U.S. 105 (1973); *Noto v. United States*, 367 U.S. 290 (1961); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982); and, *Counterman v Colorado*, 600 U.S. ___ (2023.).

Mr. Shroyer, and every person capable of speaking in the United States, has a right to utter the speech Mr. Shroyer used, and the Government has no corresponding right to punish the speaker. None of the utterances recited by the Government and attributed to Mr. Shroyer are prohibited speech. And the Government has made no serious effort to prove that Mr. Shroyer's utterances packed the inculpatory punch of prohibited speech, whether that be incitement, a true threat, or conspiracy to commit another crime. Unlike other defendants appearing before this Court in the context of the January 6 riot, Mr. Shroyer has not been charged with conspiracy to engage in seditious conspiracy. His words cannot be twisted into circumstantial evidence of an intent to oppose the authority of the Government by force. Neither has he been charged with conspiracy to obstruct an official proceeding. These charges would be hard to prove given the fact that when he stood on the Capitol steps with his entourage, Person One was using a megaphone to urge people to stand down and turn away from the Capitol.

"As we said in *Noto v. United States*, 367 U.S. 290, 297-298 (1961), 'the mere abstract teaching … of the moral propriety or even necessity for a resort to force and violence, is not the same as preparing a group for violent action and telling it to such action.'" *Brandenburg v. Ohio*, 395 U.S. 444, 448 (1969). Similarly, in *Watts*, *Noto* and *Claiborne*, the Supreme Court made clear that speech, even raucous speech, especially about public affairs, is vital to the republic.

Mr. Shroyer has every right to believe, and to assert to this very day, that the 2020 election was stolen. He can assert that the Justice Department is in the thrall of shadowy deep state figures intent on stifling freedom of speech and crushing dissent in the name of some crippling form of conformity. He can declare that President Biden is the devil incarnate, a Chinese prop placed in the White House by globalist forces. He can assert that the country stands on the precipice of disaster. He can call folks to the barricades and warn about the need to use force to protect American liberties. He can even proclaim that the Justice Department is attempting through this, and related prosecutions, to criminalize dissent. All of this falls well within the long-established protected contours of freedom of speech, even speech called extremist by those claiming a smug orthodoxy.

Mr. Shroyer pleaded guilty without the Court's having to rule on his motion to dismiss, a motion to dismiss predicated, in part, on his status as a journalist, and a requirement that the Justice Department seek express authorization from the Attorney General before prosecuting a member of the news media. Docket Entry 3, see C.F.R. Section 50.10(f)(3)[2]. He entered the plea because he came to understand that whatever

---

[2] An Addendum order by a Magistrate Judge notes the following unusual factors: "On August 19, 2021, the undersigned had a telephone conference with representatives of the USAO regarding the Complaint. The undersigned inquired as to whether: - the

his status as a journalist, he was under a previous Court order incident to his deferred prosecution agreement in an earlier case not to enter onto Capitol Grounds. This distinguishes him from other members of the cadre with whom he marched on January 6, 2021, none of whom have been arrested.

Mr. Shroyer pleaded guilty because he is guilty – he entered the grounds. He waived an indictment. He voluntarily gave federal agents his telephones as they searched for evidence relating to others about the planning of, and scope of, events at the Capitol on January 6, 2021. After agents had had a chance to study the contents of Mr. Shroyer's phones, he voluntarily sat for a proffer session with federal agents, answering truthfully the questions put to him. He didn't need to do any of this. But he recognized his mistake and sought to make amends through his conduct. He was never asked, nor was he required to, relinquish his right to speak out on matters of public concern. The Government's effort here to punish him for his speech sets a dangerous precedent.

As the Court noted, "[T]he First Amendment … still demand[s] a subjective mental-state requirement shielding some true threats from liability. The reasons related to what

---

Department of Justice considered Shroyer to be a member of the media; - the USAO had complied with Department of Justice policies regarding the arrest of media members; and - the Assistant U.S. Attorneys would memorialize the answers to these two questions in the Complaint, consistent with their prior practice. The USAO represented that it had followed its internal guidelines but was unwilling to memorialize that or explain the bases for its determinations. The Court issues this addendum Case 1:21-cr-00542-TJK Document 3 Filed 08/24/21 Page 5 of 9 6 opinion in response to the USAO's break with prior practice, and to ensure that the judicial record accurately reflects: 1) the conversations between the Court and the USAO; and 2) the undersigned's understanding of the steps taken by the Department to comply with 28 C.F.R. § 50.10." At least one Circuit Court of Appeal has recognized that the rights of citizen bloggers are clearly established. *Villarreal v. City of Laredo*, 17 F. 4th 532 (5th Cir., 2021)(the First Amendments various guarantees are clearly established law in the context of claims for qualified immunity in suits arising under 42 U.S.C. Section 1983).

is often called a chilling effect. Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries." *Counterman*, slip. op., p. 6. "Like threats, incitement inheres in particular words used in particular contexts: Its harm can arise even when a clueless speaker fails to grasp the expression's nature and consequences. But still, the First Amendment precludes punishment, whether civil or criminal, unless the speakers' words were 'intended' (not just likely) to produce imminent disorder. *Hess v. Indiana*, 414 U.S. 105, 106 (1973)(per curiam); see *Brandenburg*, 395 U.S. at 447; *NAACP v. Clairborne Hardware Co.*, 458 U.S. 886, 927-929 (1982). That rule helps prevent a law from deterring 'mere advocacy' of illegal acts – a kind of speech falling within the First Amendment's core. *Brandenburg*, 395 U.S. at 449." *Counterman*, slip. op., p. 8.

The issue of the use of protected speech as relevant conduct in a federal sentencing for conduct at a political rally that turned in to a riot is one of first impression. Mr. Shroyer contends that, just as in the case of acquitted offense conduct's invasion of the right to due process and the Fifth Amendment's presumption of innocence, so, too, punishing, or even appearing to punish ,the right to speak, to assemble and to petition for redress of grievances arising under the First Amendment should be precluded and is substantively unreasonable as a matter of law.

## II.    Conclusion

Mr. Shroyer renews his request for release pending appeal. Yes, the sentence imposed is short, but the shadow cast by this case is long, especially as the nation approaches what promises to be another fraught presidential campaign.

DEFENDANT SHROYER

By  /s/ NORMAN A. PATTIS /s/
       383 Orange Street
       New Haven, CT 06524
       203.393.3017 (phone)
       203.393.9745 (fax)
       pattis@pattislaw.com
       ct13120

**<u>CERTIFICATION OF SERVICE</u>**

The undersigned hereby certifies that, on the above-captioned date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties of record by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing.  Parties may access this filing through the Court's system.

*<u>/s/ Norm Pattis /s/</u>*

\